UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT DAVIS, and DR.BRUCE BARTON on behalf of themselves and the Putative Class,<br><br>    Plaintiffs,<br><br>    v.<br><br>BMW OF NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,<br><br>    Defendants. | Case No.<br><br><br>Civil Action<br><br>CLASS ACTION COMPLAINT AND JURY DEMAND |

Plaintiffs, by their attorneys, Nagel Rice LLP and Joseph R. Santoli, Esq., on behalf of themselves and all others similarly situated, make the following allegations on personal knowledge and information and belief:

I.   NATURE OF THE ACTION

1.   Plaintiffs bring this action for actual damages, equitable relief, including restitution, injunctive relief, and disgorgement of profits, and all other relief available on behalf of themselves and all similarly-situated individuals and entities (the "Class") who own, lease or have owned or have leased BMW or Mini Cooper vehicles equipped with a defective Electric Auxiliary Coolant Pump (herein "Fire Defect"). The affected vehicles include:

1

2011-2012 BMW 550i and 550i xDrive sedans produced between April 23, 2010, and Sept. 14, 2011,  2010-2012 BMW 550i Gran Turismo and 550i Gran Turismo xDrive sedans produced between July 30, 2009, and Sept. 8, 2011,  2012 BMW 650i and 650i xDrive coupes produced between Dec. 10, 2010, and Sept. 15, 2011,  2012 BMW 650i and 650i xDrive two-door convertibles produced between Jan. 12, 2011, and Oct. 31, 2011,  2009-2012 BMW 750i, 750i xDrive, 750Li, 750Li xDrive and 760Li sedans produced between Oct. 14, 2008, and Sept. 13, 2011,  2011-2012 BMW ActiveHybrid7 sedans produced between Sept. 24, 2010, and Sept. 6, 2011,  2010-2012 BMW X5 xDrive 50i and X5 M sport utility vehicles produced between July 30, 2009, and Nov. 19, 2011,  2008-2012 BMW X6 xDrive 50i and X6 M sport utility vehicles produced between Nov. 15, 2007, and Nov. 18, 2011, 2010-2011 BMW X6 Hybrid sport utility vehicles produced between Sept. 14, 2009, and Sept. 12, 2011,  2007-2012 Mini Cooper S and JCW coupes produced between June 28, 2007, and Sept. 23, 2011. 2008-2012 Mini Cooper S Clubman and JCW Clubman coupes produced between Jan. 28, 2008, and Sept. 23, 2011.  2011-2012 Mini Cooper S Convertible and JCW Convertible coupes produced between Oct. 28, 2010, and Sept. 23, 2011,  2011-2012 Mini Cooper S Countryman and Cooper S Countryman ALL4 four-door hatchbacks produced between Jan. 19, 2011, and Sept. 13, 2011,  2012 Mini Cooper S Coupe and JCW Coupe models produced between June 22, 2011, and Sept. 23, 2011,  2012 Mini Cooper S Roadster and JCW Roadster coupes produced

2

between Aug. 11, 2010, and Sept. 21, 2011, and  2010-2012 Rolls Royce Ghost sedans produced between Jan. 24, 2011, and Sept. 25, 2011. Additionally, the class includes owners or leases of other models, including the 2011 528i, which have not been recalled but which have exhibited the Class Defect  (hereinafter, the "Class Vehicles") manufactured and/or sold by the Defendants, BMW of North America, LLC ("BMW-NA") and Bayerische Motoren Werke Aktiengesellschaft("BMW-AG")(hereinafter collectively, "BMW" or "Defendant"). BMW acknowledges that 48,000 Class Vehicles are subject to the recall, although owners of other models have experienced the Class Defect, and thus the number is likely higher. Counsels' investigation, including a review of NHTSA's complaint database, and communications with BMW owners, suggests that Defendant's recall does not capture all of the defective vehicles which suffer from the same or substantially similar auxiliary water pump defect as the recalled vehicles.

2.    All of the claims asserted herein arise out of BMW's design, manufacture, and warranting of the Class Vehicles, as well as BMW's advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles as one of the most dependable, safe, and reliable vehicles available. Indeed, BMW touts itself as the manufacturer of "the ultimate driving machine." In this case, class members have been left with a machine that may go on fire

3

without warning, resulting in an extreme safety risk to the owner, the vehicle and the surrounding property!

3.    According to documentation submitted to the National Highway Transportation Safety Administration, the Class Vehicles contain engine control unit-driven electric auxiliary water pumps that may overheat within high-temperature environments. Specifically, the circuit boards installed in these components are prone to heat due to a critical design flaw. Consequently, electric auxiliary water pumps using these circuit boards might overheat to an extent that causes smoldering, which in turn increases the likelihood of engine fire. This threat poses a serious safety hazard to occupants.

4.    This Fire Defect is inherent in the design and/or manufacture of the Class Vehicles. As a result of the Fire Defect, Plaintiff and the other members of the Class have been subject, and continue to be subject, to a serious safety risk which can occur at any time.

5.    Defendant knew or should have known before the time it sold the first Class Vehicle, that the Class Vehicles contained the Fire Defect.

6.    The Fire Defect exposes drivers and occupants of the Class Vehicles, as well as others who are near the Class Vehicles when they catch fire, to an increased risk of accident, injury, or death.

7.    Defendant concealed from and/or failed to disclose to Plaintiff, the other members of the Class and all others in the chain of distribution, the Fire Defect, and failed to remove the Class Vehicles from the marketplace or take appropriate remedial action, even after BMW learned the precise cause of the Fire Defect. Instead, Defendant sold and serviced the Class Vehicles, and continue to sell and service the Class Vehicles, even though it knows and knew, or was reckless in not knowing, that the Class Vehicles contained the Defect, and that such failure would ultimately result in the inability of Plaintiff and the other members of the Class to use their vehicles for their intended purpose during the time Plaintiff and the other members of the Class reasonably expected they would have use of their vehicles, and subjected Plaintiff and the other members of the Class to an increased risk of accident, injury, or death.

8.    Had Plaintiffs and other members of the Class known of the Defect at the time of purchase or lease, they would not have bought or leased their vehicles, or would have paid substantially less for them.

9.    As detailed below, BMW has known about issues with the Auxiliary Water Pumps for years and prior recalls did not solve the problem. After recent complaints and negative press, including a television news reports (http://www.nbcchicago.com/on-air/as-seen-on/nbc-5-mini-cooper-recall-494574061.html)        revealing

numerous instances of Class Vehicles going on fire, BMW advised the NHTSA of a new recall. Although notice was provided to Class Members, when the Class Members sought to schedule the repairs they were advised that BMW did not have the necessary parts and they had to wait until BMW contacted them to schedule the repairs.

10. Many Class Members, including Plaintiff Barton, experienced a catastrophic fire in the interim. Other Class Members, such as Plaintiff Davis, never received a recall notice but suffered a confirmed water pump fire.

11. Plaintiffs and the Class have suffered an ascertainable loss as a result of Defendant's omissions associated with the Fire Defect, including but not limited to, out of pocket losses and diminished value of the Class Vehicles.

12. Were Plaintiff and the other Class members aware of the concealments, failures to disclose and omissions described herein, they would not have purchased their vehicles or would have paid significantly less for them.

13. Plaintiff seeks actual damages, injunctive relief, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to Plaintiff and the Class.

## II.  <u>PARTIES</u>

14. Plaintiff Dr. Bruce Barton is a Kentucky citizen who resides in Richmond, Kentucky.

15. Plaintiff Robert Davis is a Georgia citizen who resides in Hampton, Georgia.

16. Defendant BMW of North America, LLC ("BMW-NA"), is a limited liability company, organized and in existence under the laws of the state of Delaware with corporate headquarters located at 300 Chestnut Ridge Road, in Woodcliff Lake, New Jersey. BMW is the distributor and warrantor of the Class Vehicles in the United States.

17. Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW-AG") is a duly organized German corporation with its headquarters in the city of Munich, Germany. BMW-AG is the parent company of BMW-NA.

18. At all relevant times, Defendant was engaged in the business of marketing, advertising, distributing, selling, and warranting automobiles, other motor vehicles and motor vehicle components in New Jersey and throughout the United States of America. BMW-NA sells and distributes vehicles that it manufactures, as well as vehicles manufactured by BMW-AG and has a network of more than 338 independently-owned dealerships throughout the USA. BMW-NA drafted and published the owner's manual and Service and Warranty Information materials and acts as the warrantor of vehicles constructed by both Defendants which are sold in the USA.

19.   There exists at all times relevant hereto, a unity of ownership between BMW-NA, BMW-AG and their agents, such that any individuality or separateness between them has ceased and each is the alter ego of the other.  BMW-AG communicates with BMW-NA concerning virtually all aspects of the products distributed within the USA.

### III.  PLAINTIFF'S EXPERIENCE

20.   On August 19, 2017, Dr. Barton purchased a certified pre-owned 2012 BMW 750LI from Don Jacobs BMW Center in Lexington, Kentucky paying $25,711.00 for the vehicle.

21.   In deciding to purchase this BMW, Dr. Barton relied upon advertisements and other marketing materials touting the high quality, and outstanding safety record of the BMW brand.

22.   It was not disclosed to Barton that his vehicle contained the Fire Defect. Had BMW disclosed that this vehicle contained the Fire Defect, he would not have purchased the vehicle, or would have paid significantly less for the vehicle.

23.   In June of 2018, Dr. Barton first learned that his vehicle was subject to recall for the Electric Auxiliary Coolant Pump Defect when he received a recall notice. He contacted his BMW dealer to schedule the repair and was informed that they did not have the remedy yet and would be contacted when a remedy was available. The recall notice advised that BMW recommends that

owners park their vehicle outdoors until the recall remedy has been performed.

24.  In August 2018, he brought his vehicle in for an oil change at his BMW dealership and the remedy was still unavailable.

25.  On January 10, 2019, at approximately 11:00 p.m., Dr. Barton smelled smoke in the kitchen and assumed it was coming from the clothes dryer. However, when he looked at the driveway he saw smoke emanating from the right hand side of the vehicle. He had last driven the vehicle more than an hour ago. The fire department was called and by the time the fire was put out the engine was roasted. The hood latch pull cable had completely melted and access to the engine required the use of a diamond saw. The fire scorched the driveway and it was lucky that Dr. Barton's two cats had been let outside and the door was still open, or he would not have seen the fire and it may have spread to the house.

26.  Dr. Barton's insurer declared the car a total loss and determined upon inspection that the fire was caused by the Fire Defect.

27.  BMW offered him nothing upon learning of the fire.

28.  Below is a photo of the damaged vehicle after the fire:



29. Dr. Barton's vehicle had received all routine maintenance at the BMW dealership, and was last inspected in during the August 2018 oil change.

30. At all times, Dr. Barton, as did other members of the Class, drove their vehicles in a foreseeable manner, and in the manner in which they were intended to be used.

31. Dr. Barton ultimately purchased another car due to the catastrophic loss of his vehicle.

32.    On August 24, 2015, Robert Davis purchased a pre-owned 2011 BMW 528i with 83,000 miles from Chronic Chevrolet in Griffin, Georgia paying $28,000 for the vehicle.

33.    He purchased the vehicle because he believed that BMWs were safe, reliable, high performance cars, based upon his exposure to BMWs advertising.

34.    On January 9, 2017, when the vehicle had 92,000 miles, Davis experienced a loss of power in the vehicle while he was on the way to work so he returned home and parked the vehicle in the garage. A few hours later he noticed the smell of smoke and found a small fire in the engine compartment of the vehicle. He was able to open the hood and extinguish the fire with water and pull the car out of the garage.

35. His insurance company, Allstate and BMW conducted a joint examination and concluded that the cause of the fire was an unspecified failure in the electric water pump.

36. The insurance company paid $14,000 in repairs to the vehicle which Davis continues to use. However, he believes that the car has never been the same. He also experienced some smoke damage in the garage which he remediated at his own expense.

37. Davis never received a recall notice for the vehicle although he learned after the incident that other model BMWs had been recalled for Defect in the electric water pump.

11

## IV. <u>JURISDICTION AND VENUE</u>

38.  This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), as the Class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from Defendant, and seeks in the aggregate more than Five Million Dollars ($5,000,000.00), exclusive of costs and interest.  This Court also has personal jurisdiction over the parties because Defendant conducts substantial business in New Jersey, its corporate headquarters is located in New Jersey, and has had systematic and continuous contacts with New Jersey, and has agents and representatives that can be found in this State.

39.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant BMW-NA is a citizen of this judicial district, a substantial part of the events giving rise to the claims set forth herein occurred and emanated from this district, and Defendant's conduct has injured members of the Class residing in this district. Accordingly, this Court has jurisdiction over this action, and venue is proper in this judicial district.

## V. <u>NEW JERSEY LAW APPLIES</u>

40.  It is appropriate to apply New Jersey law to the nationwide claims because New Jersey's interest in this litigation exceeds that of any other state.

12

41.   New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause of the 14th Amendment, Section 1, and the Full Faith and Credit Clause, Article IV, Section 1 of the United States Constitution. New Jersey has significant contacts to the claims asserted by Plaintiff and all Class members, and thereby creates state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

42. BMW-NA headquarters is located in New Jersey and is the sole entity in the contiguous 48 states of the U.S. responsible for distributing, selling, leasing and warranting BMW vehicles.

43. The Woodcliff Lake facility handles customer relations, engineering, marketing, the warranty department and the technical training center. Customer complaints are fielded from New Jersey as is the monitoring of consumer complaints posted to both BMW and third party web-sites.

44.   BMW's warranty and engineering departments are responsible for concealing the Fire Defect from Class members and for instituting policies to deny warranty coverage to those who experience engine failure caused by the Fire Defect.

45. BMW has a vehicle preparation center in Port Jersey, New Jersey where BMW inspects and prepares vehicles for distribution throughout the United States.

46. BMW owns property in New Jersey, conducts substantial business in New Jersey and avails itself of New Jersey's laws. BMW's SAV Center Agreement expressly provides that it is to be construed under New Jersey law. Thus New Jersey has an interest in regulating Defendant's conduct under its laws rendering the application of New Jersey law to all claims asserted herein to be constitutionally permissible.

## VI. <u>TOLLING OF STATUTE OF LIMITATIONS</u>

47. Any applicable statute(s) of limitations has been tolled by BMW's knowing and active concealment and denial of the facts alleged herein. Despite their due diligence, Plaintiff and the other members of the Class could not have reasonably discovered the Fire Defect and BMW's failure to timely effectuate the necessary recall repairs until shortly before this class action litigation was commenced given the technical nature of the class vehicle design and manufacturing Defect, including materials and workmanship.

48. BMW was and remains under a continuing duty to disclose to Plaintiff and the other members of the Class the true character, quality and nature of the Fire Defect, that the Fire Defect poses safety concerns, and that the Fire Defect diminishes the resale value of the Class Vehicles. As a result of the active concealment by BMW, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

14

49.   Moreover, because the Fire Defect could not be detected due to BMW's purposefully fraudulent concealment, Plaintiff and the other members of the Class were not reasonably able to discover the Fire Defect until long after purchasing or leasing the Class Vehicles, despite their exercise of due diligence. Thus, the discovery rule is applicable to the claims asserted by Plaintiff and the other members of the Class.

50.   Any applicable statute of limitation has therefore been tolled by BMW's knowing, active concealment and denial of the facts alleged herein. BMW is estopped from relying on any statutes of limitation because of its concealment of the Fire Defect.

## VII.   FACTUAL BACKGROUND

### A.   The Reasonable And Legitimate Expectations Of Plaintiff And The Members Of The Putative Class

51.   Customers purchasing or leasing vehicles reasonably and legitimately expect that those vehicles, like the Class Vehicles at issue herein, will properly and safely function for years.

52.   In purchasing or leasing their vehicles, Plaintiff and the other members of the Class reasonably and legitimately expected their vehicles to be reliable, and to operate in accordance with all of their intended purposes – including not bursting into flames.

53.   In purchasing or leasing their vehicles, Plaintiff and the other members of the Class reasonably and legitimately

expected that the Class Vehicles would be free from the Fire Defect.

54.    The existence of the Fire Defect is a fact that would be considered material to a reasonable consumer deciding whether to purchase or lease an expensive BMW vehicle.

55.    Customers like Plaintiff and the other members of the Class, reasonably and legitimately expect and assume that a vehicle's engine will function in its intended manner, will not pose a safety hazard, and is free from defects. Plaintiff and the other members of the Class also reasonably and legitimately expect and assume that Defendant will not sell or lease vehicles with a known defect, will disclose any such defects to consumers when they learn of them, and take all steps to remedy any defect in a manner that does not cause additional cost to the customer.

56.    It was reasonable and legitimate for Plaintiff and the other members of the Class to expect BMW not to actively and intentionally conceal problems from them – such as the Fire Defect described herein, and to deny the existence of these defects for years after becoming aware of the problems.

57. Once BMW could no longer ignore the public outcry, the media frenzy, and complaints to the NHTSA, it was reasonable and legitimate for Plaintiff and the other members of the Class to expect that BMW would issue a recall and stock the necessary parts to make the repairs. However, BMW failed to schedule the recall

repairs for Plaintiff, and the Class members for well over a year, during which time Plaintiff and other Class members, experienced the Fire Defect.

58. Throughout the period that the Class Vehicles were sold and leased, BMW marketed, promoted and advertised the Class Vehicles as reliable, safe, fuel efficient and "the ultimate driving machine."

59. Plaintiff and the other members of the Class reasonably and legitimately expected BMW to disclose the existence of the Fire Defect and that the Class Vehicles were at risk of catching fire that were known to BMW at the time of sale or lease, or when the Class Vehicle were brought in for repairs.

60. Plaintiff and the other members of the Class could not have discovered the latent Fire Defect through any reasonable inspection of their vehicles prior to purchase or at any time thereafter.

61. As a consequence of BMW's exclusive knowledge and concealment about the Fire Defect, BMW owners and Class members will not discover the problem until after warranty coverage has passed.

62. Had Plaintiff and other members of the Class known about the Fire Defect while they were in the market for purchasing or leasing a vehicle, they would not have purchased or leased the Class Vehicles or, at the very least, would have paid less for

them particularly due to the increased risk of accident, injury or death.

**B.**   **The Fire Defect and Defendant's Awareness Of These Defects**

63. Plaintiffs allege that at all relevant times, specifically at the time they purchased or leased their vehicles and when their vehicles were brought in for service, Defendant knew or should have known of the Fire Defect and the safety dangers of the Fire Defect. BMW was under a duty to disclose the Fire Defect based upon its exclusive knowledge of and/or concealed material information regarding the Defect; BMW failed to disclose the Fire Defect to Plaintiffs, other Class members, or the public at any time or place or in any manner such that it could (and would) have affected Plaintiffs' and other Class members' pre-sale decision to purchase and/or lease the Class Vehicles.

64. Although BMW reported to the NHTSA that it was undertaking a recall with respect to the Class Vehicles, this was not the first time BMW vehicles had defective electric auxiliary water pumps. BMW engineers first noticed instances of electric auxiliary water pump failure back in June 2009 and internal testing revealed an issue with the circuit board assemblies installed in the pumps. Later in September 2009, Mini, a BMW brand, discovered a vehicle that suffered electric auxiliary water pump failure. In November 2010, BMW confirmed that the vehicles

experienced engine compartment fires due to electric auxiliary water pump failures linked to circuit board degradation and during the next year received reports of 81 vehicles worldwide suffering electric auxiliary water pump failures. Four of these vehicles experienced engine compartment fires. In 2011, there was a recall of 32,000 vehicles and then a January 2012 recall of 88,000 vehicles including BMW and Mini vehicles. In October 2017, BMW received a field report of an electric auxiliary water pump failure in a 2011 Mini Cooper S that was not part of its recall. BMW thereafter reassessed its engineering and field data and found signs of electric auxiliary water pump failure in other vehicles including the BMW 550i and 750i sedans. Eventually BMW launched a review of the amended electric auxiliary water pump assemblies installed in vehicles following the 2012 recall campaign and found that they were failure-prone despite an enlarged circuit path space, hall sensor holder gaps and improved plating and soldering. This resulted in the recall reported to the NHTSA on April 23, 2018, Campaign Number 18V-248.

65. Thus, BMW knew there was a problem as early as 2009 and the fix they purportedly created had not actually fixed the problem, necessitating additional recalls, after receiving significant negative publicity.

66. However, the recall did little to benefit Class members, such as Plaintiff, because the parts to make the repairs were

19

unavailable and Plaintiff's vehicle suffered a fire in the interim.

67.   There have been numerous reports regarding these fires posted on the NHTSA and other Websites. A small smattering of online complaints registered about the Fire Defect are set forth below:

Safety Issue Type: Complaints
August 20 2018 NHTSA ID Number: 11120962
Components: ELECTRICAL SYSTEM, ENGINE
NHTSA ID Number 11120962
Incident Date May 01 2016
Consumer Location WESTON, FL
Vehicle Identification No. WMWSV3C56BT******

COMPLAINT SUMMARY
Owned a 2011 Mini Cooper S ("Mini") vehicle that caused a fire and injuries at our home. The fire was discovered while the Mini was parked in our garage with the ignition off. The fire destroyed our residence, personal property and two vehicles, including the aforementioned mini. Fire authorities determined that the fire originated in the Mini's engine compartment and a subsequent investigation yielded that the cause of the fire was an electrical failure to an electrical connection for the circuit board on the auxiliary water pump. The failure ignited nearby combustibles in the engine compartment. The failure was determined to be consistent with that described in NHTSA Safety Recall Campaign 12v-008, which affected 88, 911 BMW vehicles. It is unknown why our Mini was not recalled and or included in that campaign. BMW manufactures Minis, as well as other vehicles, and it has been the subject of several recent national media reports involving numerous "unexplained" vehicle fires for which they have not accepted responsibility or provided plausible explanations for. To date, BMW has failed to do either of the latter with regards to our fire. This Complaint is being filed for the purpose of enabling the NHTSA to thoroughly investigate this matter in the

interest of public safety and in support of its mission of saving lives and preventing additional injuries.

Safety Issue Type: Complaints
September 13 2018 NHTSA ID Number: 11129198
Components: ENGINE
NHTSA ID Number 11129198
Incident Date March 29 2018
Consumer Location LOMBARD, IL
Vehicle Identification No. WMWZC5C57GW******

CRASH NO
FIRE YES
INJURIES 0
DEATHS 0

COMPLAINT SUMMARY
Our car was parked for approx. 10 minutes. The car was off and the key was with my wife.  No one was in the car, nor was it in operation on any level.  No flammable items were within the car and the car was not parked on anything flammable.  My wife also does not smoke.  The car caught on fire near the front of the engine department.  The fire department was called and they were able to put out the fire.  The car was a total loss.  The police and fire department investigated the cause of the fire and it was determined to be inconclusive.  From what I understand, the fire was so intense that it would be incredibly difficult to determine a cause of the fire.  BMW and the two other insurance companies then performed an intense review and also determined that the fire's cause was inconclusive.

From my understanding, our model had a turbo charger with an auxiliary water pump.  These pumps have been known to have a technical problem in which they don't stop running.  Over the course of time, the pump itself can overheat and in our case, ignite oil and/or fuel within the engine department.  Most people are able to see the fire start and extinguish it quickly but in our case, we did not see the fire start.

In conclusion, our car caught on fire while not
in motion or operation.  No one was in or near
the car.  The key was also not in or near the
car.  It caught on fire approx. 10 minutes after
being parked in normal conditions.  No warning
lights or check engine lights were present.  No
maintenance had been missed.  It had less than
30K miles on it and the car itself was only
about two years old.

Videos can be provided upon request.

**oester**
Grand Champion



**404**
REP
**558**
POSTS

Drives: 2011 328i 6MT Sedan

LOL, BMW continues to amaze.

"You know that $60k+ car of yours that you probably pride yourself on? Yeah you're gonna want to park that outside in the rain, sleet, snow, hail, and pollen.

Why? Oh uh.... yeah it might just catch on fire randomly.

Oh, for how long? We dunno. Probably years if its anything like our other recalls. Make sure to check out our new front wheel drive models though!"

**2011 328i 6MT 4DOOR - Black on Black, Sport Package, Premium Package, Cold Weather Package, Xenons, 3.73 diff swap**

Join Date: Dec 2014
Location: St. Louis

iTrader: (0)

**Gone But Not Forgotten - 2009 135i - Black on Black M-sport JB4**

**Water Pump problem of the 2008 Mini Cooper S** 6
Failure Date: 02/01/2017
The contact owns a 2008 Mini Cooper S. The contact was included in NHTSA campaign number: 08v657000 (engine and engine cooling), but the repair was not completed before the contact owned the vehicle. In addition, the contact experienced a failure concerning NHTSA campaign number: 12v008000 (engine and engine cooling). The vehicle was taken to a repair shop who provided an oil change and cleared a dtc. The contact later experienced extreme smoke emitting on the outside of the vehicle to the inside of the vehicle. The vehicle was coasted over to the side of the road and towed to a repair shop. The mechanic diagnosed that the water pump leaked, the engine over heated, the cylinder head was warped, and the oil filter housing gasket was leaky. The mechanic diagnosed that the engine needed to be replaced. The contact was uncertain if the vehicle would be repaired. The manufacturer was notified of the failure. The approximate failure mileage was 76,000.

**Water Pump problem of the 2011 Mini Cooper S** 8
Failure Date: 05/01/2016
I owned a 2011 Mini Cooper S ("Mini") vehicle that caused a fire and injuries at our home. The fire was discovered while the Mini was parked in our garage with the ignition off. The fire destroyed our residence, personal property and two vehicles, including the aforementioned Mini. Fire authorities determined that the fire originated in the Mini's engine compartment and a subsequent investigation yielded that the cause of the fire was an electrical failure to an

23

electrical connection for the circuit board on the auxiliary water pump. The failure ignited nearby combustibles in the engine compartment. The failure was determined to be consistent with that described in NHTSA safety recall campaign 12v-008, which affected 88,911 BMW vehicles. It is unknown why our Mini was not recalled and or included in that campaign. BMW manufactures Minis, as well as other vehicles, and it has been the subject of several recent national media reports involving numerous "unexplained" vehicle fires for which they have not accepted responsibility or provided plausible explanations for. To date, BMW has failed to do either of the latter with regards to our fire. This complaint is being filed for the purpose of enabling the NHTSA to thoroughly investigate this matter in the interest of public safety and in support of its mission of saving lives and preventing additional injuries.

68. The knowledge of the Fire Defect by BMW-NA is imputable to BMW-AG because the former was monitoring warranty claims and Class Vehicle performance in the United States and reporting back to the parent company in Munich.

C.    **BMW's Warranty**

69. BMW issued warranties to each owner or lessee of the Class Vehicles.

70. Under these warranties, BMW warrants against "defects in materials or workmanship" for four years or 50,000 miles.

71. BMW instructs owners and lessees to bring their vehicles to a BMW dealership for warranty repairs.

72. BMW has evaded its warranty obligations by failing to inform owners and lessees of the Class Vehicles of the existence of the Fire Defect.

73. In many if not most instances the Fire Defect does not manifest until after the expiration of the warranty and BWM is well aware of this fact. However, all Class Vehicles were sold or leased to Class members with the defective components thereby breaching the warranty to Plaintiffs and the Class members.

74. Plaintiffs and the Class members reasonably relied upon BMW representations regarding its warranty and the safety of the Class Vehicles. BMW omitted from all its advertising and marketing materials that the Class Vehicles had the Fire Defect.

### VIII. <u>CLASS ACTION ALLEGATIONS</u>

75. Plaintiffs brings this action on behalf of himself and all other persons similarly situated, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass (collectively, the "Classes"):

<u>The Nationwide Class</u>

All persons or entities in the United States who own, lease, or have owned or have leased, a Class Vehicle and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendant's conduct as described in this complaint (hereinafter "proposed class members" or "class members" or "the Nationwide Class").

### The Kentucky Subclass

Kentucky residents who formerly or currently own or lease one or more of the Class Vehicles and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendant's conduct as described in this complaint (hereinafter "proposed Kentucky class members" or "the Kentucky sublass").

### The Georgia Subclass

Georgia residents who formerly or currently own or lease one or more of the Class Vehicles and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendant's conduct as described in this complaint (hereinafter "proposed Georgia class members" or "the Georgia subclass").

### Fire Subclass

All persons or entities in the United States who own, lease, or have owned or have leased, a Class Vehicle and have experienced a fire in their vehicle and sustained monetary loss and/or diminution of class vehicle value damage relating to the Fire Defect (hereinafter "proposed Fire Class Members or "the Fire subclass").

### Excluded from all Classes

Excluded from the Classes are: (a) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors that purchased the Vehicles; (b) the judge to whom this

case is assigned and any member of the judge's immediate family; and (c) individuals with claims for personal injury, wrongful death and/or emotional distress.

76. <u>Numerosity/Impracticability of Joinder</u>: The members of the Class are so numerous that joinder of all members would be impracticable. Based upon NHTSA documents approximately 48,000 Class Vehicles were purchased or leased by Class members.

77. <u>Commonality and Predominance</u>: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, include, but are not limited to, the following:

    a. Whether the Class Vehicles suffer from the Fire Defect;

    b. Whether BMW knew, or reasonably should have known, that the Class Vehicles were defectively designed, manufactured, marketed, distributed, advertised, warranted, sold, leased, and serviced;

    c. Whether BMW knew or reasonably should have known of the Fire Defect before it sold and leased the Class Vehicles to Plaintiffs and the other members of the Class;

    d. Whether BMW had a duty to disclose the Fire Defect to Plaintiff and the other members of the Class sooner than they did;

    e. Whether BMW actively and intentionally concealed, failed to disclose and/or omitted material information in its marketing, advertising, sale and lease of the Class Vehicles concerning the existence of the Fire Defect;

    f. Whether BMW violated its duty to comply with recall notices or provide loaner vehicles to Class members until it had the parts to comply with the recall notices and make the repairs.

g. **Whether Plaintiffs and the other members of the Class are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;**

h. **Whether BMW violated the consumer protection laws in the New Jersey Consumer Fraud Act (hereinafter, the "CFA"), N.J.S.A. 56:8-1, et seq., and/or the consumer protection laws of the states involving sub-class members.**

i. **Whether BMW's conduct violates warranty laws, and other laws as asserted herein;**

j. **Whether, as a result of BMW's omissions and concealments of material facts related to the Fire Defect, Plaintiffs and the other members of the Class have suffered ascertainable losses, and whether Plaintiffs and the other members of the Class are entitled to monetary damages and/or other remedies, and if so the nature of any such relief;**

k. **Whether BMW's acts and/or omissions entitle Plaintiffs and the other members of the Class to treble damages, attorneys' fees, prejudgment interest and cost of suit.**

78. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the other members of the Class have suffered similar injury by the same wrongful practices by BMW. The claims of Plaintiffs and the other members of the Class all arise from the same wrongful practices and course of conduct, and are based on the same legal and remedial theories.

79. **Adequacy Of Representation**: Plaintiffs will fully and adequately assert and protect the interests of the members of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests that are contrary to or conflicting with the members of the Class.

28

80. **Superiority Of Class Action And Impracticability Of Individual Actions**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is not economically feasible and is procedurally impracticable. While the aggregate damages sustained by the members of the Class are in the millions of dollars, and are no less than five million dollars, upon information and belief, the individual damages incurred by each member of the Class resulting from BMW's wrongful course of conduct are too small to warrant the expense of individual suits. The likelihood of individual members of the Class prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, BMW has acted or refused to act on grounds generally applicable to the members of

the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

### IX. CLAIMS FOR RELIEF

### FIRST COUNT -- OMISSION
**Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, et seq.)**

81.   Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

82.   This claim is brought on behalf of the Nationwide Class and Fire Subclass.

83.   BMW has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles it knew to be defective.

84.   BMW intentionally omitted the fact that its goods, merchandise and/or services did not have characteristics, uses, benefits, or quantities that were advertised and promoted, and failed to disclose that its goods, merchandise and/or services were not of a particular standard, quality or grade.

85.   BMW had a duty to Plaintiffs and the Nationwide Class and Fire Subclass to disclose the defective nature of the Class Vehicles and the Fire Defect because:

a. BMW was in a superior position to know the true state of facts about the Fire Defect and repair costs in the Class Vehicles;

b. Plaintiffs and the Nationwide Class and Fire Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had dangerous safety defects until after manifestation of the Fire Defect;

c. BMW knew that Plaintiffs and the Nationwide Class and Fire Subclass could not reasonably have been expected to learn or discover the Fire Defect and the associated repair costs until the manifestation of the Fire Defect.

86.   In failing to disclose the Fire Defect and the associated risks and repair costs, BMW undertook active and ongoing steps to intentionally conceal the Fire Defect, and has concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the Nationwide Class and Fire Subclass with respect to the Fire Defect in the Class Vehicles.

87.   BMW intended that Plaintiffs and the other members of the Nationwide Class and Fire Subclass would rely upon its acts of concealment and/or omission by purchasing or leasing the Class Vehicles at full price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

88.   BMW intended that Plaintiffs and the other members of the Nationwide Class and Fire Subclass would rely upon its acts of

31

concealment and/or omission to avoid replacing the defective parts during the warranty period.

89.  BMW's omissions were objectively deceptive, and had the capacity to deceive reasonable consumers under the circumstances. The fact that BMW knew about and failed to disclose that the Fire Defect in the Class Vehicles was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

90.  Such practices contravene the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

91.  As a direct and proximate result of BMW's violations of the NJCFA, Plaintiffs and the other members of the Nationwide Class and Fire Subclass have suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend to repair their vehicles or replace vehicles destroyed by fire, and accordingly were harmed by Defendant's actions in violation of the NJCFA.

## SECOND COUNT – OVER CHARGING
### (Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, et seq.)

92.  Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

93.  This claim is brought on behalf of the Nationwide Class and Fire Subclass.

94.  BMW has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles at a premium price despite knowing that they were defective.

95.  BMW charged a premium for Class Vehicles, despite knowing that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

96.  BMW sets the pricing for the Class Vehicles at its headquarters in New Jersey.

97.  In its advertising, promoting, marketing, distributing, selling and leasing of the Class Vehicles, BMW undertook active and ongoing steps to charge a premium price for the Class Vehicles while intentionally concealing the Fire Defect, and has consciously concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the Nationwide Class and Fire Subclass with respect to the Defect.

98.  BMW intended that Plaintiffs and the other members of the Nationwide Class and Fire Subclass would rely upon its acts of concealment and/or omission by purchasing or leasing the Class

33

Vehicles at premium price rather than paying less to purchase or lease the Class Vehicles, or purchasing or leasing other vehicles.

99. BMW's conduct was objectively deceptive, and had the capacity to deceive and defraud reasonable consumers under the circumstances. The fact that BMW knew about and failed to disclose the Fire Defect was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

100. Such practices contravene the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

101. As a direct and proximate result of BMW's violations of the NJCFA, Plaintiffs and the other members of the Nationwide Class and Fire Subclass have suffered ascertainable losses, which include but are not limited to, the premium price the Nationwide Class and Fire Subclass paid for the Class Vehicles, the monies they were forced to expend — and will have to expend in the future — to repair and/or replace their vehicles, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

## THIRD COUNT

### (Breach of Express Warranty)

102. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

103. This claim is brought on behalf of the Nationwide Class and Fire Subclass.

104. BMW provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

105. Accordingly, BMW warranties are express under state law.

106. The components that must be repaired and/or replaced as a result of the Fire Defect, as well as the other damages caused as a result of the Fire Defect, as described herein, are covered by the express warranties BMW provided all purchasers and lessors of the Class Vehicles.

107. Plaintiffs and the other members of the Nationwide Class and Fire Subclass have complied with all obligations and requirements under the Class Vehicles' express warranties, or are otherwise excused from performance of said obligations and requirements.

108. BMW breached these warranties by selling and leasing Class Vehicles which they knew, or reasonably should have known, contained the Fire Defect and required repair or replacement within

and outside the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods or after the warranty expired, which is when the Fire Defect typically manifested.

109. Plaintiffs notified BMW of the breach within a reasonable time, and/or was not required to do so because affording BMW a reasonable opportunity to cure its breach of written warranty would have been futile. BMW also knew of the Fire Defect and yet chose to conceal it and to not comply with their warranty obligations.

110. As a direct and proximate result of BMW's breach of the Class Vehicles' express warranties, Plaintiffs and the other members of the Nationwide Class and Fire Subclass were damaged by, among other things, being forced to expend monies — and will continue to be forced to expend monies — to repair and/or replace their vehicles and diminution in value of their vehicles.

111. BMW's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, BMW's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Fire Defect and in most instances the Fire Defect do not manifest itself until after the express warranty expires.

112. The time limits contained in BMW's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Nationwide Class and Fire Subclass. Among other things, Plaintiffs and the members of the Nationwide Class and Fire Subclass had no meaningful choice in determining these time limitations the terms of which unreasonably favored BMW. A gross disparity in bargaining power existed between BMW and Plaintiffs and the Nationwide Class and Fire Subclass, and BMW knew or should have known that the Class Vehicles were defective at the time of sale.

113. Plaintiffs, and members of the Nationwide Class and Fire Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of BMW's conduct described herein.

<u>FOURTH COUNT</u>

(Breach of Implied Warranty)

114. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115. This claim is brought on behalf of the Nationwide Class and Fire Subclass.

116. BMW was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Vehicles. BMW knew,

or reasonably should have known, of the specific use for which the Class Vehicles were purchased or leased.

117. BMW provided Plaintiffs and the other members of the Nationwide Class and Fire Subclass with an implied warranty of merchantability that the Class Vehicles, and any components thereof, are merchantable and fit for the ordinary purposes for which they were sold or leased.

118. BMW impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty of merchantability included, among other things: (1) a warranty that the Class Vehicles, and the engines required for operation were manufactured, supplied, distributed, sold and/or leased by BMW were safe and reliable for providing transportation, and would not experience fire or a risk of fire and (ii) a warranty that the Class Vehicles would be fit for their intended use while the vehicles were being operated.

119. Contrary to the applicable implied warranties of merchantability, the Class Vehicles were not fit for their ordinary and intended purpose of providing Plaintiffs and the other members of the Nationwide Class and Fire Subclass with reliable, durable, and safe transportation.

120. Defendant breached the Class Vehicles' implied warranty of merchantability by selling or leasing Plaintiffs and the other members of the Nationwide Class and Fire Subclass, vehicles, and/or

components thereof, that are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from the Fire Defect at the time of sale or lease rendering the Class Vehicles unfit for their particular purpose of providing safe and reliable transportation.

## FIFTH COUNT

(Breach of Written Warranty Under the
Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*)

121. Plaintiffs, on behalf of themselves, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122. This claim is brought on behalf of the Nationwide Class.

123. Plaintiffs and other members of the Nationwide Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

124. BMW is a "supplier[]" and "warrantor[]" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

125. The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

126. BMW's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

127. BMW breached the express warranty by selling and leasing vehicles which they knew, or reasonably should have known,

contained the Fire Defect and required repair or replacement within the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods.

128. BMW's breach of the express warranty deprived the Plaintiffs and the other members of the Nationwide Class of the benefits of their bargains.

129. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

130. BMW has been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other members of the Nationwide Class brought their Class Vehicles in for diagnoses and repair of the Fire Defect.

131. As a direct and proximate result of BMW's breach of written warranty, Plaintiffs and other members of the Nationwide Class sustained damages and other losses in an amount to be determined at trial. BMW's conduct damaged Plaintiffs and other members of the Nationwide Class who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## SIXTH COUNT

**(Violation of Kentucky Consumer Protection Act, KRS § 367.110, et seq.) (On behalf of the Kentucky Subclass)**

132. Plaintiff, Barton, on behalf of himself, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

133. Plaintiff brings this claim individually and on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Class Vehicles, in the event the Court declines to certify a nationwide class under New Jersey law.

134. Defendant misrepresented the safety of the Class Vehicles after learning of their defects with the intent that Plaintiff and the Class rely on such representations in his decision regarding the purchase, lease and/or use of the Class Vehicles.

135. Plaintiff and the Class did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Class Vehicles.

136. Through those misleading and deceptive statements and false promises, Defendant violated the Kentucky Consumer Protection Act ("KCPA").

137. The KCPA applies to Defendant's transactions with Plaintiff and the Class because Defendant's deceptive scheme was carried out in Kentucky and affected Plaintiff and the Class.

138.   Plaintiff and the Class relied on Defendant's silence as to known defects in connection with their decision regarding the purchase, lease and/or use of the Class Vehicles until forced to disclose the defect.

139.   As a direct and proximate result of Defendant's deceptive conduct and violation of the KCPA, Plaintiff and the Class have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

140.   Defendant's conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Plaintiff, and thus Plaintiff is entitled to punitive damages.

<u>SEVENTH COUNT</u>

(Breach of Express Warranty, KRS § 355.2-313)
(On behalf of the Kentucky Subclass)

141. Plaintiff, Barton on behalf of himself, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

142. Plaintiff brings this claim individually and on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Class Vehicles, in the event the Court declines to certify a nationwide Class under New Jersey law.

42

143. Defendant expressly warranted - through statements and advertisements described above - that the vehicles were of high quality, and at a minimum, would actually work properly and safely.

144. Defendant breached this warranty by knowingly selling to Plaintiff and the Class vehicles with dangerous defects, and which were not of high quality.

145. Plaintiff and the Class have been damaged as a direct and proximate result of the breaches by Defendant in that the Class Vehicles purchased by Plaintiff and the Class were and are worth far less than what the Plaintiff and the Class paid to purchase, which was reasonably foreseeable to Defendant.

146. As a result of the foregoing wrongful conduct of Defendant, Plaintiff has been damaged in an amount to be proven at trial, including, but not limited to, actual and punitive damages, equitable relief and reasonable attorneys' fees.

<u>EIGHTH COUNT</u>

(Breach of Implied Warranty of Merchantability, KRS § 335.2-314)(On behalf of the Kentucky Subclass)

147. Plaintiff, Barton on behalf of himself, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

148. Plaintiff brings this claim individually and on behalf of a Class of Kentucky residents who formerly or currently own or

lease one or more of the Class Vehicles in the event the Court declines to certify a nationwide Class under New Jersey law.

149. Defendant impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use - transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

150. As described above, there were dangerous defects in the vehicles manufactured, distributed, and/or sold by Defendants, which Plaintiff purchased, including, but not limited to, defects that caused the vehicles to suddenly and without warning catch on fire.

151. These dangerous defects existed at the time the vehicles left Defendant's manufacturing facilities and at the time they were sold to Plaintiffs. Furthermore, because of these dangerous defects, Plaintiffs did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

152. These dangerous defects were the direct and proximate cause of damages to the Plaintiffs and the Class.

## NINTH COUNT

### (Unjust Enrichment)

153. Plaintiffs, on behalf of themselves, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

154. This claim is brought on behalf of the Nationwide Class, Fire Subclass, Kentucky Subclass and Georgia Subclass.

155. The warranty had value for which Plaintiffs and the proposed Class members paid, and for which Defendant agreed to render services of repair and replace.

156. The Defendant breached its implied and express warranties in that Class Vehicles were defective with respect to engine materials, workmanship, and manufacture. The Class Vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship, and manufacture defects.

157. The Defendant benefited financially from its breaches of warranty, misrepresentations and fraud as described in this complaint. The Defendant denied legitimate Class Vehicle engine warranty claims and obtained further unwarranted financial gain.

158. Plaintiffs and the Class members sustained monetary damages as described in this complaint.

159. Allowing the Defendant to retain its monetary enrichment from its wrongful and unlawful acts would be unjust and inequitable.

160. Plaintiffs and the Class members request that the Defendant disgorge its profits from its wrongful and unlawful conduct and that the Court establish a constructive trust funded by the benefits conferred upon the defendant as a result of its

wrongful conduct.   Plaintiffs and the Class members should be designated beneficiaries of the trust and obtain restitution for

### TENTH COUNT

**Violation Of The Georgia Uniform Deceptive Trade Practices Act (GA. CODE ANN § 10-1-370 *et seq.*) (On behalf of the Georgia Subclass)**

161. Plaintiff, Davis on behalf of himself, and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

162. Plaintiff brings this claim individually and on behalf of a Class of Georgia residents who formerly or currently own or lease one or more of the Class Vehicles in the event the Court declines to certify a nationwide Class under New Jersey law.

163. Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised." GA. CODE ANN. § 10-1-373(a).

164. Defendant BMW NA, plaintiff Davis, and Georgia subclass members are "persons" within the meaning of GA. CODE ANN. § 10-1-371(5).

165. At the time of sale and during the warranty period in question, defendant represented that the class vehicles were of high quality and were sold with well designed and built auxiliary electric water pumps.

166. Defendant BMW failed to disclose to plaintiff and the Georgia subclass members the known material information regarding the defective auxiliary electric water pumps as described in detail in this Complaint.

167. As a direct and proximate result of defendant's violation of the UDTPA plaintiff Davis and the Georgia subclass have been injured including incurring time and expenses related to repair and replacement of auxiliary electric water pumps, in some instances total destruction of the vehicles, as well as diminished value of the class vehicles containing the defective parts.

168. Plaintiff Davis and members of the proposed Georgia subclass seek an order enjoining defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

<u>ELEVENTH COUNT</u>

**(Breach of Implied Warranty of Merchantability)**
**(On behalf of Georgia Subclass)**

169. Plaintiff Davis on behalf of himself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

170.   George law states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.  O.C.G.A. § 11-2-314.

171.   BMW is a merchant with respect to the goods which it sold to Plaintiffs and Class Members.

173.   The goods that BMW provided to Plaintiffs and Class Members were unmerchantable at the time they were sold. Specifically, the Class Vehicles contained in the Fire Defect rendering them not fit for ordinary use as automobiles, not able to pass without objection, not of fair average quality and not confronting with promises and affirmations made.

174. BMW's failure to provide merchantable vehicles was a breach of the implied warranty of merchantability, and Plaintiff and the other Class Members were damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the Nationwide Class, Fire Subclass and Kentucky and Georgia Subclasses, prays for judgment against BMW North America, LLC and Bayerische Motoren Werke Aktiengesellschaft granting the following relief:

1.    Certification of the proposed Nationwide Class, Fire Subclass, Kentucky and Georgia Subclass and appointing Plaintiffs to represent the Classes and Plaintiffs' counsel as class counsel;

2.    All recoverable compensatory, statutory and other damages sustained by Plaintiffs and the other members of the Nationwide Class, Fire Subclass, Kentucky and Georgia Subclass;

3.    Restitution and disgorgement of all amounts obtained by BMW as a result of its misconduct, together with interest thereon, from the date of payment, to the victims of such violations;

4.    Actual, treble, and/or statutory damages for injuries suffered by Plaintiff and the other members of the Nationwide Class, Fire Subclass, Kentucky and Georgia Subclass in the maximum amount permitted by applicable law;

5.    Statutory pre-judgment and post-judgment interest on the Class damages;

6.    Injunctive and declaratory relief;

7.    Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

8.    Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury on all causes of action so triable.


DATED: October 31, 2019   NAGEL RICE, LLP
           *Attorneys for Plaintiffs and*
           *the Putative Class*

          By: /s/ *Bruce H. Nagel*
           Bruce H. Nagel
           Randee M. Matloff
           103 Eisenhower Parkway
           Roseland, New Jersey 07068
           973-618-0400
           bnagel@nagelrice.com
           rmatloff@nagelrice.com

           Joseph Santoli, Esq.
           340 Devon Court
           Ridgewood, New Jersey 07450
           201-926-9200
           josephsantoli@aol.com