**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT DAVIS and DR. BRUCE BARTON, on behalf of themselves and the Putative Class, | No. 2:19-cv-19650 (MEF)(AME) |
| *Plaintiffs*, | **OPINION and ORDER** |
| v. | |
| BMW OF NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, | |
| *Defendants*. | |

**Table of Contents**

I.    **Background**
     A.    **The Allegations**
     B.    **Procedural History**
     C.    **The Motion**
II.   **Choice of Law**
     A.    **General Principles**
     B.    **This Case**
III.  **Actual Conflict**
IV.   **Section 148**
     A.    **Reliance**
     B.    **Receipt of Representations**
     C.    **Making Representations**
     D.    **Domicile**
     E.    **Subject of the Transaction**
     F.    **Performance**
     G.    **Conclusion**
          1.    **Factors**

    **2. Cases**

**V.**   **Section 6**

    **A.**   **Comity**

    **B.**   **Expectations**

    **C.**   **Goals**

    **D.**   **Administration**

    **E.**   **State Interests**

**VI.** **Conclusion and Next Steps**

\*    \*    \*

People who bought certain cars came to believe that the car engines had a defect.

So they sued, invoking, among other things, state consumer-fraud law.

The car owners now move to certify a nationwide class.

The motion is denied.

\*    \*    \*

**I.**   **Background**

    **A.**   **The Allegations**

The allegations[1] as relevant for now are as follows:

Three people[2] bought cars. <u>See</u> Second Amended Class Action Complaint and Jury Demand ("Complaint") (ECF 66) ¶¶ 14-16, 19, 31, 37. Two are from Georgia, one is from Kentucky. <u>See id</u>. ¶¶ 14-16.

The manufacturer of the cars[3] has its headquarters in New Jersey. <u>See id</u>. ¶¶ 17-18.

---

[1] Because this is a motion to dismiss, the Court must take all of the Plaintiffs' allegations as true. <u>See</u> <u>McTernan</u> v. <u>City of York</u>, 577 F.3d 521, 526 (3d Cir. 2009). Whether they are in fact true is a question for later in the case.

[2] Robert Davis, Dr. Bruce Barton, and Reshard Snellings.

[3] BMW of North America, LLC.

There was a problem with the cars --- defective parts upped the risk that the engine would catch on fire. <u>See</u> <u>id</u>. ¶¶ 2-7, 21-22, 33-34, 38-39.

The car buyers came to believe that the manufacturer knew about the defect, but went ahead and sold the cars anyway. <u>See</u> <u>id</u>. ¶¶ 7, 9, 68-72.

And per the buyers, the defect reduced the cars' value; had they known about the defect upfront, they would have paid less for the cars than they did, or would not have bought them in the first place. <u>See</u> <u>id</u>. ¶¶ 8, 12.

### B.   <u>Procedural History</u>

In light of the above, the car buyers (from here, "the Plaintiffs") filed this lawsuit --- a putative class action, on behalf of themselves and others who bought or leased cars with the same alleged defect. <u>See</u> <u>id</u>. ¶ 1, 79.

The lawsuit runs against the New Jersey-based car manufacturer (from here, "the Defendant"), <u>see</u> <u>id</u>. at ¶¶ 1-2, 17-18, and presses a number of claims. <u>See</u> <u>id</u>. ¶¶ 85-191.

One is relevant for now: the claim that the Defendant violated state consumer fraud law. <u>See</u> <u>id</u>. ¶¶ 85-105 (Counts 1 and 2).

### C.   <u>The Motion</u>

As to this claim, the Plaintiffs move to certify a nationwide class of "[a]ll persons or entities in the United States who owned or leased one or more defective vehicles during the class period." Plaintiffs' Brief in Support of Motion for Class Certification, and Appointment of Class Representatives and Class Counsel ("Plaintiffs' Brief") (ECF 90-1) at 19 (cleaned up).[4]

---

[4]  Three things. <u>First</u>, the Plaintiffs also move to certify a nationwide class as to a breach of express warranty claim, <u>see</u> Complaint ¶¶ 106-17 (Count 3), and a breach of implied warranty claim. <u>See</u> <u>id</u>. ¶¶ 118-24 (Count 4); <u>see</u> <u>also</u> <u>id</u>. ¶¶ 145-56, 173-78 (Counts 7, 8, and 11) (parallel claims under Georgia and Kentucky law, to be considered, per the Plaintiffs, in the event the Court declines to certify nationwide classes). To streamline things, the warranty claims are taken up in a separate Opinion & Order, to be issued later today. <u>Second</u>, there are other claims in this case --- under federal law, <u>see</u> <u>id</u>. ¶¶ 125-35 (Count 5), and state law. <u>See</u> <u>id</u>. ¶¶ 157-64 (Count 9). But the Plaintiffs have not moved to certify classes

The motion is now before the Court.[5]

## II.  **Choice of Law**

The Court's analysis here starts (and all but ends) with choice-of-law considerations.

Begin by working through some overarching general principles, see Part II.A, and then a description of how they apply in this case.  See Part II.B.

---

under these counts, so they are not relevant for now.  There are also claims under the Kentucky Consumer Protection Act, see id. ¶¶ 136-44 (Count 6), and for violations of the Georgia Uniform Deceptive Trade Practices Act and the Georgia Fair Business Practices Act.  See id. ¶¶ 165-72, 179-91 (Counts 10 and 12).  But the Plaintiffs only ask the Court to certify "statewide classes under the [consumer fraud] laws of Georgia and Kentucky" as a fallback, Plaintiffs' Brief at 19, "in the event the Court declines to certify a nationwide Class under New Jersey [consumer fraud] law."  Id. ¶¶ 137, 166, 180.  The fallback claims are discussed very briefly, in Part VI.  Third, the Plaintiffs also ask the Court to certify a subclass consisting of owners or lessees that actually "experienced fire-related damage to their vehicles or property."  Plaintiffs' Brief at 20 (cleaned up).  This, too, is addressed very briefly in Part VI.

[5]  A quick issue.  The Defendant argues that the motion should be denied "because the proposed classes include class members who lack Article III standing."  BMW of North America LLC's Brief in Opposition to Plaintiffs' Motion for Class Certification ("Defendant's Brief") (ECF 92) at 13 (cleaned up).  It backs this up with the Supreme Court's statement in TransUnion LLC v. Ramirez, 594 U.S. 413 (2021), that "[e]very class member must have Article III standing in order to recover individual damages."  Id. at 431.  But the TransUnion Court stated that it was not resolving the question of "whether every class member must demonstrate standing before a court certifies a class." Id. at 431 n.4 (emphasis omitted).  Accordingly, the Third Circuit has directed district courts to follow Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353 (3d Cir. 2015), a pre-TransUnion case holding that "[i]n the context of a class action, Article III must be satisfied by at least one named plaintiff," but that "unnamed, putative class members need not establish Article III standing."  Id. at 359, 362 (cleaned up); see Huber v. Simon's Agency, Inc., 84 F.4th 132, 155 (3d Cir. 2023) (confirming Neale's continued viability after TransUnion).

A.    **General Principles**

Federal Rule of Civil Procedure 23 lays out the main requirements for certifying a class.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011).  And it is for the plaintiff to show that Rule 23's boxes have been checked.  See Reyes v. Netdeposit, LLC, 802 F.3d 469, 484-85 (3d Cir. 2015).

As part of carrying its Rule 23 burden, the plaintiff is generally required to establish the body[6] of substantive law that will control resolution of the proposed class members' claims.

And this requirement holds when, as here, a plaintiff seeking to represent a class argues that one state's laws should apply nationwide, to everyone across the country asserting a particular type of claim.  See 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 5:46 (22d ed. 2025) ("In cases where the plaintiffs seek to assert state common law or statutory claims and seek to certify a class that includes members from multiple states, the court must address choice of law issues."); Powers v. Lycoming Engines, 328 F. App'x 121, 124 (3d Cir. 2009) ("A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply."); In re Mercedes-Benz Tele Aid Cont. Litig., 257 F.R.D. 46, 55 (D.N.J. 2009), abrogated on other grounds by, Maniscalco v. Brother Int'l (USA) Corp., 709 F.3d 202 (3d Cir. 2013) (same); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 347-48 (D.N.J. 1997) (same); In re Sch. Asbestos Litig., 789 F.2d 996, 1007 (3d Cir. 1986) (similar); Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996) (similar);

---

[6]  Or "bodies," because multiple states' laws can sometimes apply to the same sort of claim pressed by members of the same class. See, e.g., 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 5:46 (22d ed. 2025) (noting that it is possible, in some cases, for state law variants to be "grouped together by substantial similarities"); Powers v. Lycoming Engines, 328 F. App'x 121, 127 (3d Cir. 2009) ("If a complete choice-of-law analysis had been conducted and indicated that more than one jurisdiction's law applied. . . . A relevant inquiry would have been 'whether varying state laws [could] be grouped by shared elements and applied as a unit in such a way that the litigation class is manageable'") (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 529 (3d Cir. 2004)); In re Prudential Ins. Co. Am. Sales Pracs. Litig. Agent Actions, 148 F.3d 283, 315 (3d Cir. 1998) (similar).

Chin v. Chrysler LLC, 538 F.3d 272, 277 (3d Cir. 2008) (similar).

Accordingly, the party moving to certify such a class bears the burden of "credibly demonstrat[ing], through an 'extensive analysis' of state law variances" which state's law (or states' laws) should apply. Powers, 328 F. App'x at 124 (quoting In re Sch. Asbestos Litig., 789 F.2d at 1010); see Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986); see also Ford Motor Co., 174 F.R.D. at 340; Dzielak v. Whirlpool Corp., 2017 WL 6513347, at *15-16 (D.N.J. Dec. 20, 2017); Chin v. Chrysler Corp., 182 F.R.D. at 453; St. Louis Chiropractic v. Fed. Ins. Co., 2008 WL 4056225, at *12 (D.N.J. Aug. 26, 2008); Sanders v. Johnson & Johnson, Inc., 2006 WL 1541033, at *4 (D.N.J. June 2, 2006).

\* \* \*

Why is establishing choice of law a key part of the Rule 23 class-certification analysis?

There are a number of reasons. Take one up here.

To see it, imagine that a bond prospectus contains a misrepresentation, and that bond-buyers in state X and state Y want to come together to sue the bond-issuer in a class action.

And say further that the state laws are different. Under the law of state X, a plaintiff bond-buyer can recover if she shows that the defendant bond-seller made a misrepresentation. Nothing more is needed. But under the law of state Y, a plaintiff must show something extra. That the defendant lied, yes. But also that she (the bond-buyer) relied on the misrepresentation.

Can a single, all-encompassing class of bond buyers be certified?

Maybe yes, if the law of one state governs adjudication of all the putative plaintiffs' claims.

After all, if, say, state X's law applies across the board, then each class member's claim will turn on the answer to the same question, the one that is singularly relevant under the law of state X: was there a misrepresentation?

And when class members' claims rise and fall together like that, based on resolution of a common, overarching question --- that often weighs in favor of certifying a class. See Fed. R. Civ. P. 23(a)(2), (b)(3); Wal-Mart Stores, 564 U.S. at 350 (explaining that commonality generally requires that the

"determination of [a contention's] truth or falsity will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke") (citing Richard A. Nagareda, <u>Class Action Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. Rev. 97, 132 (2009)).

But the road to class certification is rockier if <u>some</u> bond-buyers' claims are governed by the law of state X (misrepresentation needed for liability), while the claims of <u>others</u> are governed by state Y law (misrepresentation needed for liability, plus reliance) --- but <u>all</u> of the claims are proposed to be yoked together, in a single class.

After all, if the lawyers for a lumped-together class are forced to spend much more of their time factually investigating the state-Y-law claims (because getting to the bottom of individual reliance issues is often hard, knotty work), are the state-Y-law claimants getting a kind of implicit cross-subsidy from the state-X-law claimants (who could have made it more cheaply and quickly over the goal line of liability, without investing in any reliance investigation)?

And will that disjunct generate predictable fissures within the class --- on the front end (as to litigation strategy), or toward the back end (in the run-up to negotiating a settlement)?

Internal divergences like this can make a single, overarching class that much harder to manage --- in a way that weighs against class certification.  <u>See</u> Fed. R. Civ. P. 23(b)(3)(D) (directing courts to consider "the likely difficulties in managing a class action" when certifying a class under this standard).[7]

And splits within the class, with some claims covered by one state's law and others covered by another state's law --- that may erode commonality and predominance, too.

---

[7]  <u>See also</u> <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 191 (3d Cir. 2001) (noting that certification under Rule 23(b)(3) for litigation purposes requires inquiry into manageability); <u>Georgine</u>, 83 F.3d at 632-33 (similar); <u>In re Prudential</u>, 148 F.3d at 315-16 (similar); <u>In re Sch. Asbestos Litig.</u>, 789 F.2d at 1010-11; <u>cf.</u> <u>Amchem Prods., Inc.</u> v. <u>Windsor</u>, 521 U.S. 591, 619-20 (1997) (explaining that manageability is not so much a concern in cases where class certification is sought for settlement purposes); <u>In re Warfarin</u>, 391 F.3d at 529 (same).

Trial will have to revolve around two questions (misrepresentation and reliance, in the example), and not just one question (misrepresentation). Both "was there a misrepresentation?" (for class members whose claims are governed by state X law), and "was there misrepresentation and reliance?" (for class members whose claims are governed by state Y law).

Multiplicity like this can reduce the likelihood of class certification, because it acts as a kind of centrifugal force, tending to pull things apart to an extent --- and therefore making it that much harder to keep the case focused on a single, central, "common" point, a place where it might be resolved in "one stroke." Wal-Mart Stores, 564 U.S. at 350.[8]

In short: whether a plaintiff can clear key Rule 23 class-certification hurdles like predominance, commonality, and manageability --- that will often depend on whether the proposed class members' claims are covered by a single body of substantive law. See Powers, 328 F. App'x at 124 ("[A]ttempts to structure and certify nationwide classes involving plaintiffs in all fifty states often turn on whether the law of a single state or multiple states should be applied.").

And that is one of the reasons why, as part of carrying its overall class-certification burden, a plaintiff must generally

---

[8] To be sure, the application of multiple bodies of law to a claim will not always make it harder to certify a single, overarching class aimed at resolution of that claim. In some circumstances, differences in substantive law may not go to the heart of how the case will be litigated. Is commonality, see Fed. R. Civ. P. 23(a)(2), for example, meaningfully whittled away if some class members on a do-not-call registry (covered by state law A) get $10 for every unwanted phone call, while other class members (covered by state law B) get $100? The delta between $10 and $100 is important in terms of practical outcomes. It generates an "actual conflict." See Part III. But does it spin off any genuinely difficult issues of, say, class management? See Fed. R. Civ. P. 23(b)(3)(D). Maybe not. The point is only this: not all substantive-law dissonances have the same impact. Some will have a knock-on effect on the Rule 23 analysis that may preclude class certification. Others will not. Getting at these issues is part of the "rigorous" analysis district courts must conduct at the class certification stage. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982). But these issues can only be worked through if they are teed up, by determining what law or laws will be applied.

make a showing as to the substantive law (or laws) that will
control the claims proposed for class-wide resolution.

The question of whether one state's law will control, across the
board, is too important for too many Rule 23 questions to be
left for later.

### B.    **This Case**

As proposed by the Plaintiffs, the claims of all putative
nationwide class members would be governed by New Jersey law ---
specifically, the state's Consumer Fraud Act.  See Plaintiffs'
Brief at 38-44; Complaint ¶¶ 85-105 (Counts 1 and 2).

This proposal raises unmissable choice-of-law complexities.
After all, the putative class members come from many different
states, not just New Jersey.  See Plaintiffs' Brief, Exhibit 17
("Exhibit 17") (ECF 91-5) at 1-5.

*    *    *

How to analyze choice of law here?

The Court's diversity jurisdiction has been invoked in this
case, under the Class Action Fairness Act of 2005.  See
Complaint ¶ 43 (citing 28 U.S.C. § 1332(d)(2)).

And a federal court sitting in diversity "applies the choice-of-
law rules of the forum state --- here, New Jersey --- to
determine the controlling law."  Maniscalco, 709 F.3d at 206
(applying this principle in a case under the Class Action
Fairness Act); accord, e.g., In re Volkswagen and & Warranty
Extension Litig., 692 F.3d 4, 8, 17 (1st Cir. 2012) (same);
Loreto v. Procter & Gamble Co., 515 F. App'x 576, 578 (6th Cir.
2013) (same); Jackson v. Payday Fin., LLC, 764 F.3d 765, 771,
774 (7th Cir. 2014) (same); see also Klaxon Co. v. Stentor Elec.
Mfg. Co., Inc., 313 U.S. 487, 496 (1941).

Under New Jersey's choice-of-law rules, a court must first
determine whether there is an "actual conflict" between the
different bodies of laws that may be in play.  P.V. ex rel T.V.
v. Camp Jaycee, 197 N.J. 132, 143 (2008).

Here, the Plaintiffs have argued that New Jersey law should
apply nationally to every putative class member's consumer-fraud
claim.  See Plaintiffs' Brief at 32.  But they have also alluded
to an alternative possibility.  If New Jersey law cannot apply
to a nationwide class, the Plaintiffs argue, each class member's
claim would be governed by the substantive law of that class
member's "home state".  Id. (cleaned up); see also Defendant's

Brief at 21 (arguing that the "law of [the Plaintiffs'] home states" should apply).

If there is no actual conflict between the bodies of law that have been offered up (New Jersey law versus home-state laws), then the inquiry ends, as "there is no choice-of-law issue to be resolved." Camp Jaycee, 197 N.J. at 143.

But if there is an actual conflict, a genuine choice-of-law analysis is triggered.

How to work through that if there is an actual conflict?

"New Jersey has adopted the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws." Maniscalco, 709 F.3d at 206; see Camp Jaycee, 197 N.J. at 142–43. As between the laws put in play, the court must determine which has the "most significant relationship" to the claim, and apply that law. Camp Jaycee, 197 N.J. at 155.

The factors used to determine "significan[ce]" vary based on the type of claim at issue. Id. at 140–42.

Alleged violations of consumer fraud law count as tort claims. See Maniscalco, 709 F.3d at 204, 207 (applying tort provisions of the Restatement to a New Jersey Consumer Fraud Act claim); Cooper v. Samsung Elecs. Am., Inc., 374 F. App'x 250, 254–55 (3d Cir. 2010) (same); Beegal v. Park W. Gallery, 394 N.J. Super. 98, 119–21 (App. Div. 2007) (same).

And as will be seen soon, because the alleged tort violation here sounds in fraud and misrepresentation, it is Section 148 of the Restatement (Second) that must be applied to decide which consumer-fraud law applies --- New Jersey's or the claimants' home state laws.

Move to the choice-of-law analysis now, in Part III and Part IV.[9]

---

[9]   A note before getting started.  Choice-of-law analysis is comparative and relative.  It asks: if there is a car accident in state C, what law should be applied --- the law of state A, state B, or state C?  But before getting to that question, there is an earlier question to answer: which bodies of law should be put on the table in the first place?  Are the laws of states A, B, and C the right ones to compare?  Should some of these be removed from consideration?  Answering those questions does not call for comparative or relative judgments.  Rather, answering them calls for assessing the reach of each possibly relevant state's legislative jurisdiction --- to decide whether that state's law can legitimately be part of the head-to-head

comparison that needs making.  For example, if state A's law, through statutes or cases, says "our law, state A law, cannot be applied to accidents that take place outside of state A," then state A's law simply cannot reach the state C accident --- even if, as a matter of comparison with the laws of state B or state C, the law of state A might otherwise have been chosen.  And if the federal Constitution forbids the application of state A law to the case, see Allstate Ins. Co. v. Hague, 449 U.S. 302, 307-08 (1981), then same result: state A law simply cannot reach the state C accident, regardless of whether on a comparative basis it might seem like a better pick than state B law or state C law.  Bottom line: first comes the question of the reach of legislative jurisdiction, which determines the state laws that can be compared; and then comes the choice-of-law analysis, which is where the actual comparing gets done.  (In a New Jersey context, these issues are unpacked in Schulman v. Zoetis, Inc., 684 F. Supp. 3d 275, 285-87 (D.N.J. 2023).  For more general approaches, see Restatement (Third) of Conflict of Laws, § 5.01 reporter's notes cmt. b (A.L.I., Tentative Draft No. 3, 2022); see also Kermit Roosevelt III, The Myth of Choice of Law: Rethinking Conflicts, 97 Mich. L. Rev. 2448 (1999); Larry Kramer, Interest Analysis and the Presumption of Forum Law, 56 U. Chi. L. Rev. 1301 (1989)).  Here, the parties skip over the first question, the legislative jurisdiction question.  Instead, they focus only on the next question, the comparative and relative one.  The Plaintiffs argue that New Jersey law should prevail over the home-state laws, see Plaintiffs' Brief at 31-40, and the Defendants argue the opposite.  See Defendant's Brief at 14-24.  The Defendants do not argue, for example, that the Plaintiffs' proffered comparison cannot be the right one in the first place.  For example, they do not argue that as a matter of the state-law or federal-law outer limits on New Jersey legislative jurisdiction, New Jersey law cannot be part of the mix here, regardless of what the alternative might be --- because New Jersey law simply cannot reach a car-buy in Arizona by an Arizona resident or a car-lease in Michigan by a person from Florida.  The Court follows the parties' lead.  See United States v. Sineneng-Smith, 590 U.S. 371, 375-76 (2020).  It therefore presumes that New Jersey law could reach all of the relevant claims.  And it asks here only the relational choice-of-law question: whether New Jersey law should apply, as against the other possibility being offered up, the home-state law of each claimant.

### III. **Actual Conflict**

Recall that under New Jersey choice-of-law rules, the first step in the analysis is to ask whether there is an "actual conflict" between the laws that are offered up. <u>Camp Jaycee</u>, 197 N.J. at 143.

Here, as noted, the bodies of law that have been put in play are New Jersey's consumer-fraud law (the New Jersey Consumer Fraud Act) and the consumer-fraud laws of the various home-states of the proposed class members. <u>See</u> Plaintiffs' Brief at 36-38; <u>see also</u> Defendant's Brief at 21 (arguing that "the law of [the Plaintiffs'] home states" should apply).

As between these, the Plaintiffs concede that there is a conflict. <u>See</u> Plaintiffs' Brief at 32 (asserting that "[t]he [New Jersey Consumer Fraud Act] does conflict with some provisions of other states' consumer protection laws," and that "[c]onsequently, the Court must proceed to step two and determine which state has the 'most significant relationship' to the facts and issues in the case").

And the Defendants seem to agree. They describe the two-step analysis required under New Jersey law, and then jump straight to the second step. <u>See</u> Defendant's Brief at 16-17.

The parties' shared belief that there is an actual conflict here seems to make sense.

To see why, look, for example, to three of the laws put before the Court: the New Jersey Consumer Fraud Act, the Kentucky Consumer Protection Act, and the Georgia Fair Business Practices Act. <u>See</u> Complaint ¶¶ 94, 104, 140, 181.

The New Jersey and Georgia statutes do not require any particular mental state from the defendant. But under the Kentucky act, liability hinges on whether the defendant acted intentionally or with gross negligence. <u>Compare</u> <u>Heyert</u> v. <u>Taddese</u>, 431 N.J. Super. 388, 410-11 (App. Div. 2013), <u>and</u> <u>Regency Nissan, Inc.</u> v. <u>Taylor</u>, 194 Ga. App. 645, 647 (1990), <u>with</u> <u>Campos</u> v. <u>Louisville Metro Police Officers Credit Union</u>, 2018 WL 4760501, at *7 (W.D. Ky. Oct. 2, 2018).

Another example.

The New Jersey and Kentucky laws do not require a plaintiff to show that she relied on the defendant's misrepresentations. But the Georgia statute goes the other way. It requires a showing of reliance, plus a showing that the reliance was reasonable. <u>Compare</u> <u>Union Ink Co., Inc</u> v. <u>AT&T Corp.</u>, 352 N.J. Super. 617, 645-46 (App. Div. 2002) (citing N.J.S.A. § 56:8-2), <u>and</u> <u>Corder</u>

v. <u>Ford Motor Co.</u>, 869 F. Supp. 2d 835, 839 (W.D. Ky. 2012), with <u>Raysoni</u> v. <u>Payless Auto Deals, LLC</u>, 296 Ga. 156, 156–157 (2014).

There is, in short, real daylight between the various laws as they are written.

To be sure, on-paper differences, standing alone, do not generally qualify as "actual conflict[s]" --- because what is required are differences that might impact "bottom-line," real-world outcomes in the case at hand.  <u>See</u> <u>Webway 360, Inc.</u> v. <u>Xerox Corp.</u>, 2025 WL 3161999, at *1 n.7 (D.N.J. Nov. 12, 2025).

But here, that piece of the puzzle has been filled in by the parties.  As noted, they have conceded that there is an "actual conflict" --- presumably because, based on their knowledge of the case, they have concluded that the differences between the various bodies of law would have a practical effect here.

Given the above, the actual-conflict box is checked, and the Court moves on to the second stage of the analysis.[10]

That second stage boils down to this: as between the contenders that have been put forward, which law has the "most significant relationship," <u>Camp Jaycee</u>, 197 N.J. at 144–45, to the consumer-fraud claim here?  New Jersey law?  Or the law of the various home states of the people who bought or leased the cars?

Take that up just below.

## IV.  Section 148

The consumer-fraud counts of the complaint, <u>see</u> Complaint ¶¶ 85-105 (Counts 1 and 2), turn on these allegations:

- That the Defendant "intentionally omitted the fact that its . . . merchandise . . . did not have characteristics . . . that were advertised and promoted, and failed to disclose

---

[10]  In this diversity case, the Court follows New Jersey choice-of-law rules --- which, as noted, require wading into a sustained choice-of-law analysis only when there is an actual conflict.  <u>See</u> <u>Camp Jaycee</u>, 197 N.J. at 143.  But answering the key Rule 23 class-certification questions will almost always require consideration of choice-of-law --- for reasons sketched out above, in Part II.A.  This means that federal law, the law of Rule 23, generally <u>itself</u> requires a choice-of-law analysis, <u>see</u> <u>McLaughlin</u> § 5:46 --- even if for some reason the relevant state law choice-of-law rules do not.

that its goods . . . were not of a particular standard." Complaint ¶ 88.

- And that the Defendant took "active and ongoing steps to charge a premium price" for the defective vehicles through "advertising, promoting, marketing, distributing, selling, and leasing" those vehicles, "despite knowing" that its vehicles were defective and "intentionally concealing" the defect to consumers.  Id. ¶¶ 98-99, 101-02.

These are plainly allegations of fraud and misrepresentation.

And when such allegations are at issue, the Court must look to Section 148 of the Restatement (Second) to determine the body of law that has the "most significant relationship" to the claim.[11] Maniscalco, 709 F.3d at 207.

Under Section 148, "when the plaintiff's action in reliance take place in a different state than where the false representations were made and received," id., courts weigh the following to determine which of those states' laws apply:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil[e], residence, nationality, place of incorporation and place of business of the parties,

---

[11]  In a footnote, the Plaintiffs assert that Section 148 "is inapplicable" because the consumer-fraud claim here is based on misrepresentations made by means of "omissions," Plaintiffs' Brief at 32 n.15 (emphasis added), and not by means of affirmative misstatements.  But courts applying New Jersey choice-of-law rules have routinely applied Section 148 to omissions-based claims.  See, e.g., Maniscalco, 709 F.3d at 207; Serrano v. Campbell Soup Co., 773 F. Supp. 3d 127, 152-53 (D.N.J. 2025); Pet Gifts USA, LLC v. Imagine This Co., LLC, 2015 WL 5822584, at *2, 5 (D.N.J. Oct. 2, 2015); Majdipour v. Jaguar Land Rover N. Am., LLC, 2013 WL 5574626, at *4, 8 (D.N.J. Oct. 9, 2013); Schecter v. Hyundai Motor Am., 2020 WL 1528038, at *1, 5 (D.N.J. Mar. 31, 2020); Shapiro v. Logitech, Inc., 2019 WL 397989, at *1, 7-9 (D.N.J. Jan. 31, 2019); Gelis v. Bayerische Motoren Werke Aktiengesellschaft, 2018 WL 6804506, at *4 (D.N.J. Oct. 30, 2018).

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2) (A.L.I 1971).

Walk through these six factors now.

### A.    <u>Reliance</u>

The first Section 148 factor considers "the place, or places, where the plaintiff acted in reliance upon the defendant's representations." <u>Id</u>. § 148(2)(a).

Here, this refers to people who bought or leased cars ("acted"), and in doing so "relied upon [the Defendant's] representations regarding its warranty and the safety of the . . . [v]ehicles." Complaint ¶ 78.

These "act[s]" of buying or leasing were not in some way concentrated in New Jersey.

The experience of the named Plaintiffs makes that clear.  Two of them, each a resident of Georgia, bought their cars in Georgia. <u>See</u> Plaintiffs' Brief, Exhibit 7 ("Exhibit 7") (ECF 90-9) at 4 (Davis Dep. 24:17-23) (referring to Griffin, Georgia); Plaintiffs' Brief, Exhibit 10 ("Exhibit 10") (ECF 90-12) at 4-5 (Snellings Dep. 44:9-12, 45:6-11) (stating that- the car was purchased at a Ford dealer "in Atlanta").  And the third, a resident of Kentucky, is represented as having bought his car in Kentucky.  <u>See</u> Plaintiffs' Brief at 12 (asserting that "Dr. Barton purchased a certified pre-owned [vehicle] from Don Jacobs BMW Center in Lexington, Kentucky").[12]

In short, the way that the Plaintiffs allegedly "acted in reliance upon the defendant's representations," Restatement (Second) § 148(2)(a), was in buying or leasing the relevant

---

[12]  In support of this assertion, the Plaintiffs point to a deposition taken of Barton.  <u>See</u> Plaintiffs' Brief at 12.  But the cited pages make no reference to Kentucky.  <u>See</u> Plaintiffs' Brief, Exhibit 9 (ECF 90-11) at 9 (Barton Dep. 61:22-62:3).  No matter.  The Defendants agree that Barton bought his car there. <u>See</u> Defendant's Brief at 4 ("Barton . . . purchased a certified pre-owned [vehicle] from Don Jacobs BMW in Lexington, Kentucky.").

cars.  See Complaint ¶¶ 12, 19-20, 31-32, 37-38.  And this did not mainly (or even disproportionally) happen in New Jersey.

Therefore, the first Section 148 factor weighs against nationwide application of New Jersey law and in favor of the claimants' home-state laws --- because that is where, it seems, people generally bought or leased the cars at issue.

And this conclusion is backed up by the caselaw.  See, e.g., Maniscalco, 709 F.3d at 205, 208 (in factually similar circumstances, determining that this factor weighed in favor of applying the laws of the putative plaintiffs' home states); Montich v. Miele USA, Inc., 849 F. Supp. 2d 439, 448 (D.N.J. 2012) (same); Morcom v. LG Elecs. USA, Inc., 2017 WL 8784836, at *12 (D.N.J. Nov. 30, 2017) (same); In re Mercedes-Benz Tele Aid Cont. Litig., 257 F.R.D. at 66-67 (same); Feldman v. Mercedes-Benz USA, LLC, 2012 WL 6596830, at *3, 6 (D.N.J. Dec. 18, 2012) (same); Majdipour, 2015 WL 1270958, at *10 (same).

                          *     *     *

The Plaintiffs appear to make two counterarguments: "[1] people purchase cars and move from state to state with their vehicles or [2] even buy them online."  Plaintiffs' Reply Brief in Further Support of Motion for Class Certification, and Appointment of Class Representatives and Class Counsel ("Reply Brief") (ECF 94) at 4.

But as to [1], the first Section 148 factor is focused on where a person "acted in reliance" on alleged misrepresentations.  Restatement (Second) § 148(2)(a).  Here, that "act[ion]" was buying or leasing the cars.  See Complaint ¶¶ 12, 19-20, 31-32, 37-38.  What was done with the cars after they were bought or leased does not enter into the equation.[13]

_____

[13]  Maybe the argument is that a person continues to "act[] in reliance," Restatement (Second) § 148(2)(a), on alleged misrepresentations whenever and wherever they use a product --- and that cars are used (though not mainly, see American Driving Survey: 2023, at 4, https://newsroom.aaa.com/wp-content/uploads/2024/08/202408-AAAFTS-American-Driving-Survey-2023.pdf?pubDate=20251111 (last visited Nov. 23, 2025)) outside of one's home state.  But if that is the argument, the Plaintiffs point to no caselaw support for it.  And it is an odd fit for a consumer-fraud claim (which tends to focus on the point-of-purchase) and not on other sorts of tort claims (which sometimes focus on continuing harms associated with use of a particular product).

And as to [2], the argument seems to rest on the idea that a person may have bought her car online.

But why should that possibility loom large?  Most people do not buy cars online.  See U.S. Census Bureau, Estimated Annual U.S. Retail Trade Sales — Total and E-commerce: 1998-2018, in Annual Retail Trade Survey: 2018, https://www.census.gov/data/tables/2018/econ/arts/annual-report.html (last visited Nov. 23, 2025) (indicating that, at least as of 2018, less than 3% of total retail car sales were made online); see also Exhibit 7 at 4 (Davis Dep. 24:17-23) (indicating that the plaintiff in question bought his car at a dealership);[14] Exhibit 10 at 4-5 (Snellings Dep. 44:9-12, 45:6-11) (same).

And in any event, online buying can only change the picture for this Restatement factor if a person gets online to buy her car from a different state than the one she lives in.

But why assume that?  Everyday experience teaches that most people most of the time go online from home or from work or as they walk around in their neighborhood.  So there would be no reason to assume that, say, an Ohio resident who bought her car online got online to buy it in Illinois or Indiana --- and therefore that it was from one of those two states that she acted in reliance on misrepresentations, and not from Ohio.

### B.    Receipt of Representations

The next Section 148 factor: "the place where the plaintiff received the [allegedly false] representations."  Restatement (Second) § 148(2)(b).

Here, as noted, the alleged "[mis]representation[]," id., is an omission.  That is, the Plaintiffs claim that the Defendant should have provided them with information as to the alleged defect, but did not.  See Complaint ¶ 78.

Where does one "receive[]," Restatement (Second) § 148(2)(b), an omission?

---

[14]  Although the deposition transcript indicates that Davis bought his vehicle at "Car Net," --- which may, by its name, imply an online retailer --- other references show that the car was purchased in person, at a dealership.  Namely, the plaintiff's statement that he "purchased [the car] in Griffin" at a Chevrolet dealership.  Exhibit 7 at 4 (Davis Dep. 24:17-23).

Everyday experience is again clarifying.[15]

It suggests that (a) shopping around for a product (including gathering information about it), and (b) buying the product --- these are generally bundled up together tightly enough, such that the state where a person buys something will usually be the same state that he received information about it.

If a person buys a car, for example, in Maine, it is a fair bet that he got smart about the possible car-buy in Maine, too. Studying performance specs, looking at brochures, taking a look at warranties --- all mainly in Maine, at a car dealership there or sitting in front of a computer there.

And the place where the buyer was affirmatively provided with some information about the car --- that is also the place where the car buyer would normally have expected to get the rest of the assertedly relevant information, the information that was allegedly omitted.

Bottom line: in the absence of information to the contrary, a court may proceed, for purposes of Section 148, on the assumption that the state where a car was bought or leased is the state where (a) information about it was received, and (b) information about it that should have been provided was omitted.

Caselaw supports this conclusion. See, e.g., In re Mercedes-Benz Tele Aid Cont. Litig., 257 F.R.D. at 66 (concluding, in nearly identical factual circumstances, that the "[p]laintiffs presumably received and relied on Mercedes's alleged misrepresentations in their home states"); Clark v. Prudential Ins. Co. of Am., 2009 WL 2959801, at *8 (D.N.J. Sept. 15, 2009 (similar); Morcom, 2017 WL 8784836, at *12 (similar); Majdipour, 2013 WL 5574626, at *9 (concluding that "the place where [the] Plaintiffs . . . received the [relevant] representations" was the place where the plaintiffs "allege[d] they purchased their vehicles after reviewing marketing material and interacting with [company] employees"); Avram v. Samsung Elecs. Am., Inc., 2013 WL 3654090, at *15 (D.N.J. July 11, 203) (similar); see also Maniscalco, 709 F.3d at 208; Feldman, 2012 WL 6596830, *6 (similar).

The import of all this: the second Section 148 factor (where omissions were received) tilts away from New Jersey law (because there is no particular reason to think omissions were received here), and toward the laws of car consumers' home states

---

[15] And the parties here offer no argument to the contrary.

(because that is where consumers bought or leased cars, and, it can be assumed, received information about them).

### C.  **Making Representations**

The next factor: "the place where the defendant made the representations."  Restatement (Second) § 148(2)(c).

The parties seem to agree that at least some of the relevant "[mis]representations" (in the form of omissions) were made from New Jersey, where the Defendant is headquartered.  See Plaintiffs' Brief at 33-35; Defendant's Brief at 20 n.10.

There may be a wrinkle to this, as the Defendant contends that at least "some of the alleged wrongful conduct [also] occurred in Germany."  Defendant's Brief at 19-20.[16]

But put that aside for now, and assume arguendo that the omissions were made in New Jersey, such that this factor fully cuts in favor of applying New Jersey law to the Plaintiffs' consumer-fraud claims.

### D.  **Domicile**

The fourth factor: "the domicil[e], residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) § 148(2)(d).

Here, this factor adds a weight to each side of the balance scale.  To the New Jersey side, because the Defendant's principal place of business is here.  See Complaint ¶¶ 17-18. And to the home-state-law side, because the people in the proposed class are from all over the country --- their "domicil[e], [and their] residence" is not concentrated in New Jersey, but is scattered across the 50 states.  Restatement (Second) § 148(2)(d); see Exhibit 17 at 1-5.

This looks at first like equilibrium.

The New Jersey "place of business" of one "part[y]," Restatement (Second) § 148(2)(d), the Defendant, pushes toward application of New Jersey law.  And the disparate domiciles and residences of the members of the proposed class push away from New Jersey law, and toward application of the various laws of the class members' home states.

---

[16]  This is presumably because the Defendant's parent company is headquartered in Germany.  See Complaint ¶¶ 16-17.

But while these are opposite forces, they are not equal ones.

Under the Restatement, the Plaintiffs' residence is of "substantial significance when the loss [as here] is pecuniary in its nature." Id. § 148(2) cmt. i.  And per the Restatement, the non-New Jersey residences of the Plaintiffs are a "more important," id., consideration than the New Jersey connections of the Defendant.  See id.

Therefore, this factor leans against applying New Jersey law here --- and the Third Circuit has so held in similar circumstances.  See Maniscalco, 709 F.3d at 208.

### E.    Subject of the Transaction

The fifth factor: the location where the "tangible thing which is the subject of the transaction between the parties was situated at the time" of the transaction.  Restatement (Second) § 148(2)(e).

Here, the "subject[s] of the transaction," id., are the allegedly defective cars.

And the facts, as they have been put before the Court, imply no meaningful New Jersey connections to this factor.  The car sales and car leases ("the transaction[s]") apparently took place around the United States.  See Part IV.A.  And there is no suggestion that while these transactions were happening, the cars (the "tangible thing[s] which [are] the subject of the transaction[s]," Restatement (Second) § 148(2)(e)) were then located ("situated at the time," id.) in New Jersey --- maybe, for example, in a warehouse here.

Therefore, this factor does not lean in favor of applying New Jersey law.  Accord, e.g., In re Mercedes-Benz Tele Aid Cont. Litig., 257 F.R.D. at 67; Morcom, 2017 WL 8784836, at *12; Majdipour, 2013 WL 5574626, at *9; Avram, 2013 WL 3654090, at *15; Feldman, 2012 WL 6596830, *6.[17]

---

[17]  The Plaintiffs suggest that "[t]he place where the tangible thing was situated is a toss-up since people purchase cars and move from state to state with their vehicles."  Reply Brief at 4.  Cars move across state lines, true.  But mostly, they are used close to home.  See, e.g., American Driving Survey: 2023, at 4.  And in any event, this Restatement factor is about where the car was when it was bought or leased, "at the time" of the transaction.  Restatement (Second) § 148(2)(e).  Not where it

**F.**    **Performance**

The last factor is "the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant."  Restatement (Second) § 148(2)(f).

As to the car-buying-Plaintiffs who are members of the putative class, what is the contractual "performance" to be "render[ed]"? Id.

Presumably, any contract the Plaintiffs may have had[18] was, at its core, a sales contract --- in the context of which the buyers' "performance," id., was simply to hand over money (and in exchange to get a car).[19]

But if paying money is what Section 148 of the Restatement means by a plaintiff's "performance," id., then in sales contract cases, the place-of-performance factor (the sixth one) will virtually always point in the same direction as another Section 148 factor (the first one): the "place . . . where the plaintiff acted in reliance upon the defendant's representations."  Id. Why?  Because in a sales contract case the plaintiff's action-in-"reliance" (under the first factor) is also paying money --- the money he would not have paid but for the defendant's alleged misrepresentation.

This is double counting.  One aspect of things, the place of payment, would be tallied up twice in the Section 148 analysis --- under the first factor, and also again under the sixth factor.  And the Third Circuit seems to have suggested that Section 148 should be interpreted to avoid double counting.  See Maniscalco, 709 F.3d at 208.

---

might later have been taken by a car owner or lessee, after the transaction.

[18]  "May have had" because while there are here-and-there references to sales contracts for the cars at issue, those references are glancing.  See Complaint ¶ 175; Plaintiffs' Brief at 40.

[19]  See generally 18 Samuel Williston & Richard A. Lord, Williston on Contracts § 52:1 (4th ed. 2025) (explaining that under a "sales contract" it is generally the "obligation of the seller to transfer and deliver the goods, and that of the buyer to accept and pay for them"); Sale, Black's Law Dictionary (12th ed. 2024) (defining one of the elements of a sales contract to be "a price in money paid or promised").

This suggests that the sixth factor of Section 148 should have no role to play in the analysis when it comes to an ordinary sales-contract circumstance.

And the language of the sixth factor points in the same direction.

The sixth factor is "the place where the plaintiff is to render performance under a contract."  Restatement (Second) § 148(2)(f) (emphasis added).

This implies that performance is something to come, something off in the future, something that "is to" be done.  Id.

But that is not when plaintiff-side "performance" (payment) is typically "render[ed]" in a sales-contract case.  Id.  Payment will not generally take place in the future.  Rather, it usually happens at around the same time as goods are exchanged; pay the money, get the car.

By contrast, when it comes to other sorts of contracts, like executory contracts --- plaintiff-side performance is very much something pushed out into the future.  The contract is signed at Time 1, and the plaintiff has performance obligations at Time 2 and Time 3.[20]

In short: the language of the sixth factor of Section 148 of the Restatement is not a smooth fit for everyday sales contracts, but it works for executory contracts.

And note that in the context of an executory contract, the double-counting problem is not there, either.

When it comes to an executory contract, the first Section 148 factor and the sixth will not necessarily point in the same direction.

An executory-contract example makes the point.  Under the first Section 148 factor, a company may have "acted in reliance upon the defendant's representations," Restatement (Second) § 148(2)(a), in Colorado, by building a factory there to satisfy a long-term contract with the defendant to supply gloves or shoes.  But the sixth factor, "the place where the plaintiff is

---

[20]  See generally 1 Williston on Contracts § 1:19 (4th ed. 2025) (defining an "executory contract" as one "that contemplates that the performance of a contractual duty is to occur in the future," and contrasting this with "sales completely carried out on both sides"); Executory, Black's Law Dictionary (12th ed. 2024) ("Taking full effect at a future time.").

to render performance under [the executory] contract," Restatement (Second) § 148(2)(f), may be Utah or Montana, where, under the imagined contract, the plaintiff is to deliver the gloves or shoes.

Bottom line: (a) to avoid double-counting, and (b) to faithfully read the precise words of the Restatement, the sixth factor of Section 148 should generally play no role when the underlying contract is an ordinary sales contract.[21]

And this conclusion does not read sixth factor out of Section 148. Because Section 148 plainly applies to other sorts of contracts, like executory contracts --- as to which there is no similar double-counting problem, and the linguistic fit is better.

                    *    *    *

In light of the above, when it comes to the car buyers among the Plaintiffs' proposed class, the Court concludes that the sixth factor of Section 148 is irrelevant. If anything, the car buyers' contracts were sales contracts. And as to sales contracts, the sixth factor has no meaningful role to play.

                    *    *    *

This said, the sixth factor is relevant to the car lessees in the Plaintiffs' proposed class.

By definition, car lessees have performance obligations (that is, payment obligations) out into the future. Their contracts are executory contracts, and so (a) there is not always double counting as between the first and sixth Section 148 factors[22] and (b) the language of the sixth factor works well.

So when it comes to the car lessees among the proposed Plaintiffs, factor six of Section 148 does have a role to play in the analysis.

Here, that factor cuts against application of New Jersey law. Because there is simply no suggestion in this case that car-lessees made lease payments primarily or even disproportionally in New Jersey, as opposed to throughout the United States. And

---

[21] This conclusion is backed up by some of the comments to Section 148. See Restatement (Second)§ 148 cmts. f, i.

[22] The Plaintiffs might make lease payments on a car in a number of different states; the state where they signed the lease, foe example, and the state where they might have moved while they are still making lease payments.

the place of performance by the Plaintiffs (that is, the place of payment by the Plaintiffs) is what the sixth factor of Section 148 makes relevant.

*    *    *

In a nutshell: the sixth factor either has no bearing here (as to car-buyer Plaintiffs), or points away from application of New Jersey law (as to car-lease Plaintiffs).

### G.  **Conclusion**

#### 1.  **Factors**

Step back now to see where things stand.

Of the six Section 148 factors, four weigh against applying New Jersey consumer-fraud law to all members of the nationwide putative class.

These are, first, the place where people "acted in reliance" on the car-maker's representations --- because that "reliance" was buying or leasing cars, and that allegedly happened around the country, with no special connection to New Jersey.[23]  See Part IV.A.

Then, second, the place where the car-buyers and -lessees "received" the relevant representations --- because what the car-maker allegedly left out presumably should have been conveyed in connection with car-buys and car-leases, and those took place throughout the Nation, with no particular link to New Jersey.[24]  See Part IV.B.

Third, where the parties are most deeply rooted (domicile, residence, etc.) --- a factor that does not lean New Jersey's way because Section 148 privileges where plaintiffs live (here, around the United States) over where a defendant does its main business (here, New Jersey).  See Part IV.D.

Fourth and finally, the place where the cars were when they were bought or leased --- because the cars look to have been

---

[23]  At least, that is, with no special connection to New Jersey put forward as to this factor by the Plaintiffs, who bear the burden.

[24]  See footnote 23.

scattered across the country, with no disproportional concentration in New Jersey.  See Part IV.E.[25]

\*   \*   \*

Another factor tilts the other way, in _favor_ of applying New Jersey law.

The parties agree, at least to an extent, that the relevant omissions here can be taken as having been made by the Defendant from its New Jersey headquarters.  See Part IV.C.

\*   \*   \*

And as to last factor, the place where the plaintiff was to "render" performance, the analysis is more complex.  See Part IV.F.  As to class members who were car buyers, this factor is irrelevant.  And as to class members who were car lessees, this factor affirmatively weighs against applying New Jersey law.

## 2.  **Cases**

The Section 148 line-up, in short, is 4—1-1 against application of New Jersey law (as to car-buyers, with the sixth factor put aside as irrelevant) or 5-1 against New Jersey law (as to car-lessees).

That adds up to the following conclusion: even "[a]ccepting [the Plaintiffs'] premise that [all] actionable omissions [were made by the car-maker Defendant] at its headquarters in New Jersey," a "single contact . . . does not warrant applying New Jersey law" nationwide.  Maniscalco, 709 F.3d at 208.

And in cases like this one, when the factors are arrayed roughly as they are here, federal courts have routinely held that New Jersey consumer-fraud law does not apply, but rather the various consumer-fraud laws of the plaintiffs' home states.

Take as examples three cases in which the Section 148 scorecard was 4-1, closely similar to the way the factors fall out here:

- In Maniscalco v. Brother International (USA) Corp., 709 F.3d 202 (3d Cir. 2013), the plaintiffs aimed to pull together a class action based on allegations that certain printer defects had not been properly disclosed.  See id. at 204-06.  The printer company was based in New Jersey, so that favored looking to New Jersey consumer-fraud law.  See id. at 208.  But the printers had been bought nationally, and there were no other meaningful New Jersey connections.

---

[25]  See footnote 23.

See id.  The Third Circuit, reviewing on a de novo basis, see id. at 206, held that New Jersey law did not apply across the board.  See id. at 208-09.  The Section 148 factors lined up 4-1, in essentially the same way they do here.  See id.  But a "single contact" pointing toward New Jersey law --- namely, that the New Jersey-headquartered defendant made "actionable omissions" from there --- did "not warrant applying New Jersey law to a nationwide class."  Id. at 208-09.

- The plaintiffs in Maloney v. Microsoft Corp., 2011 WL 5864064 (D.N.J. Nov. 21, 2011), accused the defendant of selling defective MP3 players, see id. at *1, and sought to stitch together a nationwide class.  See id.  The Section 148 factors were again racked up roughly as here.  Four favored application of the "consumer fraud laws of each class member's home state."  Id. at *10.  Another factor, as to "the domicile, residence, nationality, place of incorporation, and place of business of the parties," was put aside as "neutral."  Id.  And one factor, "the place where the defendant made the representations," weighed against applying the laws of the plaintiffs' home states.  See id.  A 4-1 split, and this outcome: Section 148 suggested that the various home state laws should apply, not New Jersey's.  See id. at *9-10.

- Lastly, when TVs did not work as they were supposed to, in Nikolin v. Samsung Electronics America, Inc., 2010 WL 4116997 (D.N.J. Oct. 18, 2010), plaintiffs sought to assemble a class on a consumer-fraud claim.  See id. at *1-2.  The court's analysis also ran 4-1, with the factors laid out in roughly the same way as here.  Four factors tugged in favor of home-state laws: (1) where the plaintiffs relied on representations, (2) where the representations were received, (3) where the TVs were, and (4) the state where the parties resided or had their principal place of business.  Id. at *4.  One factor ran the other way: the New Jersey "location of the manufacturer's headquarters" where the manufacturer ostensibly made the misleading representations.  Id.  Result: "allegations that the unlawful conduct emanated from New Jersey did not outweigh the substantial ties to plaintiffs' home states based on the other factors under § 148(2)."  Id.

In a nutshell: in consumer-fraud cases like this one, courts considering 4-1 splits have routinely concluded that what

controls is the law of the plaintiffs' various home states --- not the law of the place from which the defendant made its representations.[26]

Accordingly, the Court's conclusion, applying Section 148 of the Restatement, is that the Plaintiffs have not carried their burden of showing that New Jersey consumer-fraud law applies nationwide.

### V.    Section 6

The Section 148 conclusion set out just above is not the end of the road.

Under New Jersey law, a Section 148 conclusion must generally be stress tested against the more general principles laid out in Section 6 of the Restatement.  See Maniscalco, 709 F.3d at 209-10.

Boiled down "to their essence," these principles are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states."  Camp Jaycee, 197 N.J. at 147

---

[26] Some courts have come to the same home-state-law conclusion in cases that look factually like this one --- but that are not strictly speaking 4-1 cases because the court opted to analyze fewer than five of the Section 148 factors.  See, e.g., Montich, 849 F. Supp. 2d at 441, 448-49 (in a nationwide case involving defective washing machines, holding that the plaintiffs' home state consumer-fraud laws applied, not the law of New Jersey, even though the defendant was "headquartered in New Jersey" and the "unlawful conduct emanated from New Jersey," id. at 449 (cleaned up), because three factors --- "(a) place of reliance, (b) place where plaintiff received the representation, and (e) the place where a tangible thing which is the subject of the transaction is located" --- favored applying the law of the plaintiffs' home states, id. at 448); Arlandson v. Hartz Mountain Corp., 792 F. Supp. 2d 691, 696-97, 709 (D.N.J. 2011) (in a class action involving defective flea treatments, holding that the plaintiffs' home state consumer-fraud laws applied --- even though the headquarters of the defendant was in New Jersey and the relevant representations came from there, because the plaintiff "received and relied upon the alleged misrepresentations in their home states, the product is located in the [p]laintiffs' home states, and the performance of the contract was rendered in [p]laintiffs' home states").

Here, these do not change the picture.  To see why, move through the Section 6 principles.

### A.  <u>Comity</u>

Take, <u>first</u>, interstate comity.

In a case factually similar to this one, discussed above, the Third Circuit held that "the interests of interstate comity favor applying the law of the individual claimant's own state." <u>Maniscalco</u>, 709 F.3d at 209.

And in factually similar cases lower federal courts have landed on the same conclusion.  <u>Montich</u>, 849 F. Supp. 2d at 450 (same); <u>Pet Gifts USA</u>, 2015 WL 5822584, at *7 (same); <u>Avram</u>, 2013 WL 3654090, at *16 (same); <u>Mendez</u> v. <u>Avid Budget Grp., Inc.</u>, 2012 WL 1224708, at *12 (D.N.J. Apr. 10, 2012) (same).

In all of this, federal courts (applying New Jersey choice of law rules) have leaned on a New Jersey intermediate appellate decision: <u>Fink</u> v. <u>Ricoh Corp.</u>, 365 N.J. Super. 520 (Law Div. 2003).  <u>See</u>, <u>e.g.</u>, <u>Maniscalco</u>, 709 F.3d at 209 (citing <u>Fink</u>); <u>Montich</u>, 849 F. Supp. 2d at 450 (same); <u>Mendez</u>, 2012 WL 1224708, at *12 (same); <u>see also Pet Gifts USA</u>, 2015 WL 5822584, at *7 (citing <u>Maniscalco</u> citing <u>Fink</u>); <u>Avram</u>, 2013 WL 3654090, at *16 (same).

In turn, <u>Fink</u> squarely held that the interests of interstate comity "clearly require application of the law of any potential claimant's state of residence," 365 N.J. Super at 585, rather than the New Jersey consumer-fraud law, because application of New Jersey had potential to "frustrate the policies of other interested states."  <u>Id</u>. (quoting <u>Fu</u> v. <u>Fu</u>, 160 N.J. 108, 122 (1999)).  "To ignore the policies of these states by applying New Jersey consumer fraud across a nationwide class of potential claimants primarily because [the defendant] ha[d] its principal place of business in New Jersey would frustrate the public policies of those other states."  <u>Id</u>. at 585-86.

In short: ample federal and state caselaw supports the conclusion that the first of the Section 6 principles cannot push aside the Section 148 conclusion in this case.

*    *    *

Against this, the Plaintiffs' press a counterargument: "applying the [New Jersey consumer-fraud law] will not upset other states' interests in protecting their citizens because the [New Jersey consumer-fraud law] is one of the strongest consumer protection laws in the country."  Plaintiffs' Brief at 36 (cleaned up).

But this is not persuasive.

To see why, begin by imagining[27] that every state has a consumer-fraud law that allows injured victims to be compensated, but that each of the 50 states also allows for punitive damages ranging from $1 (in Alabama, the first state alphabetically) to $25 (in Missouri, the middle state) to $50 (in Wyoming, the last).

Sticking with the hypothetical, the Plaintiffs' counterargument seems to rest on the idea that if an Alabama car-owner is subjected to a consumer fraud, Alabama would be content to allow Wyoming's more generous law to provide the measure of recovery. After all, the argument seems to go, applying Wyoming law means more money for the Alabama car-owner.

But what is the basis for this counterargument?  To continue with the hypothetical, what sources does it purport to rest on as to how to interpret Alabama state law?  It does not, for example, cite the text of an Alabama statute, or the holdings of the Alabama Supreme Court.

And if (continuing with the hypothetical) Alabama's goal was simply for its citizens to get maximal recoveries, why would it not just have set damages at $50 under its own law?

The fact that it has not gone to the furthest end of the spectrum implies the possibility that Alabama has other goals in mind, beyond just pushing up recoveries for its residents.

For example, Alabama might believe that by setting tort damages at a relatively lower level, it will make car-buying more affordable in the state --- because car-sellers will feel less compelled to build in steep price premiums when they are selling to Alabama buyers to cover large anticipated liabilities.

And if price-containment is part of Alabama's goal, that goal might well be directly undercut by increasing manufacturer punitive-damage liability.

Put differently, the Plaintiffs speak of "other states' interests in protecting their citizens" being vindicated if they can make use of the New Jersey consumer-fraud law, which they say is "one of the strongest consumer protection laws in the country."  Id. (cleaned up).

But states often have multiple interests.  And in practice, advancing one interest may trade off against another.

---

[27]  Counter factually.

The Plaintiffs seem to assume that, if given a chance, Alabama (in the hypothetical) would be content to get a bigger recovery for its citizens by applying Wyoming law.  But why indulge the assumption that Alabama did not choose the precise balance between competing concerns that it actually wanted?  If what Alabama wanted was what amounts to Wyoming law, why would it not have just set its punitive damages number at $50, as Wyoming has?[28]

These questions sit just below the surface of the Plaintiffs' counterargument.  In the end, there may be solid answers to them.  But for now, the Plaintiffs do not try to take them on -- - and without trying to do so, they cannot carry their burden of establishing choice of law here.

### B.   __Expectations__

The __second__ Section 6 principle can be put to the side as irrelevant.

---

[28]  Maybe the Plaintiffs' answer to all this would be that Alabama would be content to see larger recoveries for its citizens where those recoveries would (as here) come from out-of-state defendants.  __See__, __e.g.__, Brainerd Currie, __Selected Essays on the Conflict of Laws__ 85-86 690-721 (1963).  But that might well have a similar impact (maybe the same impact) on in-state car prices.  Moreover, that sort of approach might raise constitutional questions related to legal discrimination against out-of-state entities.  __Cf__. John Hart Ely, __Choice of Law and the State's Interest in Protecting Its Own__, 23 Wm. & Mary L. Rev. 173 (1981).  And even if all that is put aside, the Plaintiffs' argument proves too little.  How to know whether Alabama wants Wyoming law (all the way to $50) and not something else, like Missouri law ($25)?  That is, even if there is a circumstance in which a state can be taken as wanting to apply a more pro-plaintiff-than-usual law (because the plaintiff is a local but the defendant is not) --- why suppose that, in that circumstance, the state wants "one of the strongest consumer protection laws in the country" (like Wyoming in the hypothetical), Plaintiffs' Brief at 36, and not something more modest in the direction of "stronge[r] . . . protection" (like Missouri in the example)?  __Id__.  The Plaintiffs here do not try to answer these questions.  But they are unmissably implied by their counterargument, and the answers to them cannot simply be assumed.

This factor "requires courts to focus on [the parties'] justified expectations." Fu, 160 N.J. at 123 (quoting Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 199 (1998)).

But while protecting expectations is "of extreme importance in the field of contracts," the New Jersey Supreme Court has held that this factor "ordinarily plays little or no part in a choice-of-law question in the field of torts." Id. (citing Restatement (Second) § 145 cmt. b).

### C.  **Goals**

The third Section 6 principle requires courts to "consider the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of" a given law. Id. (citing Restatement (Second) § 145 cmt. c).  So "[w]hen [a] tort rule primarily serves a deterrent purpose, the state where the harmful conduct took place will likely have the dominant interest with respect to that rule." Id.  But "[w]hen the tort rule is designed primarily to compensate a victim for his or her injuries, the state where the injury occurred, which is often where the plaintiff resides, may have the greater interest in the matter." Id.

Applying New Jersey law, the Third Circuit has all but held that this factor is a wash here --- because consumer-fraud laws have a mixed purpose, folding together (in roughly equal measure, the court of appeals has implied) deterrence purposes and compensation purposes. See, e.g., Maniscalco, 709 F.3d at 210 ("The third section 6 factor likely favors neither state. Consumer fraud law serves the dual purposes of compensating injured parties --- which might favor South Carolina law --- and deterring corporate misconduct --- which might favor New Jersey law.").

### D.  **Administration**

The fourth Section 6 principle --- the interest of judicial administration --- has little bearing here.  It focuses on "whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered" by the proposed law to be applied.  Pfizer, Inc., 154 N.J. at 199.

But here, the Plaintiffs contend that if New Jersey law cannot be applied to all nationwide consumer-fraud law claims, then two statewide classes should be certified --- a Georgia class (applying Georgia law) and a Kentucky class (applying Kentucky law).

Will these ultimately be certified?  Maybe, maybe not.  That question is down the road.  See Part VI.

But the Plaintiffs' proposed fallback is neither "extraordinarily complex," Pfizer, 154 N.J. at 199, nor intrinsically difficult to envision pulling off.  It does not, say, involve the application of scores of bodies of state law. See In re Accutane Litig., 235 N.J. at 235-36.

And so it cannot be said that "the fair, just and timely disposition of controversies," Pfizer, 154 N.J. at 199, would be meaningfully advanced by moving away from the conclusion drawn under Section 148, see Part IV, and applying New Jersey law instead of the Plaintiffs' home state laws.

### E.   State Interests

The fifth and final Section 6 principle --- "the competing interests of the states," see Camp Jaycee, 197 N.J. at 147 --- pushes against applying New Jersey law across the board.

New Jersey has an interest in holding in-state corporations like the Defendant accountable for the consumer frauds they allegedly perpetrate.  See Maniscalco, 709 F.3d at 210.

But in a case that was factually similar to this one, the Third Circuit held that the interests of plaintiffs' home states "in having [their] law[s] apply to [their] own consumers outweighs the interests of New Jersey in protecting out-of-state consumers from consumer fraud" allegedly emanating from the state.  Id.; see also Knox v. Samsung Elecs. Am., Inc., 2009 WL 1810728, at *4 (D.N.J. June 25, 2009) (similar); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. at 348 (similar).

## VI.   Conclusion and Next Steps

In sum:

The Plaintiffs seek to apply New Jersey consumer-fraud law here nationwide, but they have not carried their burden of establishing that would be appropriate.

Section 148 of the governing Restatement does not point in the direction of applying New Jersey law.  See Part IV.  And nothing in Section 6 of the Restatement alters that conclusion.  See Part V.

*     *     *

The Plaintiffs' proposed fallback position is that if the New Jersey Consumer Fraud Act cannot apply across the board, then the Court should "certify Georgia and Kentucky subclasses or breach of the consumer protection statutes of those states." Plaintiffs' Brief at 40; Reply Brief at 5; Complaint ¶¶ 137, 146, 152, 166, 174, 180.

But the Plaintiffs have made next to no affirmative argument for this, and the burden of establishing choice of law is theirs to carry. See Part II.A; Reyes, 802 F.3d at 484-85; Powers, 328 F. App'x at 124 (quoting In re Sch. Asbestos Litig., 789 F.2d at 1010); In re Ford Motor Co., 174 F.R.D. at 340).

And moreover, as to the proposed statewide classes, the Plaintiffs have not carried their burden of showing that, more generally, the Rule 23 requirements for class certification (predominance, etc.) have been satisfied. This is because their legal papers have focused all but entirely on how the overarching Rule 23 requirements might line up if New Jersey law applies, not on how things might go if it does not.

"The burden of proving each of the requisite elements of Rule 23 is on the party seeking certification, and failure to prove any element precludes certification." McLaughlin § 3:11. As to proposed classes under Georgia and Kentucky law, and as to proposed "fire" subclasses, too --- that work has not been done.

*    *    *

For the reasons discussed above, the Plaintiffs' motion to certify a nationwide class under the New Jersey Consumer Fraud Act is denied.

And for now at least, the Plaintiffs have also failed to satisfy their burden of showing that classes can be certified under Georgia and Kentucky law. They have not made a choice of law showing as to application of those laws. And they have not made arguments, tailored specifically to proposed Georgia and Kentucky classes, as to how the various Rule 23 factors might play out. Therefore, any motion-in-the-alternative to certify narrower consumer fraud law classes under state law is also denied.

*    *    *

If the Plaintiffs will seek to certify classes for claims under Georgia and Kentucky law, and/or "fire" subclasses under the same, they may do so on a schedule to be set by the United States Magistrate Judge.

IT IS on this 24th day of November, 2025, **SO ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.