**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT DAVIS, DR. BRUCE BARTON, and RESHARD SNELLINGS on behalf of themselves and the Putative Class,<br><br>*Plaintiffs*<br><br>v.<br><br>BMW OF NORTH AMERICA, LLC,<br><br>*Defendant* | 19-cv-19650 (MEF)(AME)<br><br>**OPINION** |

**Table of Contents**


**I. Background**

**A. Law**

**B. Facts**

**II. Standing**

**A. The Split**

**B. More Detail**

**C. Types of Overpayment**

**D. The Periods**

**1. Time 1 to Time 2**

**2. Time 2 to Time 3**

**3. Time 3 to Time 4**

**III. Next Steps**


* * *

A Georgia man bought a car. But it turned out to have an engine defect, and that generated a fire risk.

The car manufacturer announced a recall and the car was repaired. It never caught fire.

Because of the defect he bought it with, the man came to believe that he had overpaid for the car --- so he sued.

The question here is whether he has standing.

* * *

## I. Background

### A. Law

Federal courts can resolve only "real controvers[ies] with real impact[s] on real persons." TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021) (internal quotation omitted).

So to go forward, a plaintiff must have standing --- he must show[1] that he suffered an "injury in fact that is concrete, particularized, and actual or imminent." Id. at 423, 30-31.

In a case like the one here --- a putative class action at the class-certification stage --- the Court must satisfy itself that each proposed class representative has been injured and has standing. See Huber v. Simon's Agency, Inc., 84 F.4th 132, 154-55 (3d Cir. 2023).

Here, the question is whether one of the proposed class representatives, the one from Georgia,[2] has been injured.

From here, he is called "the Plaintiff."

* * *

---

[1] Among other things.

[2] Reshard Snellings. There are two proposed class representatives, and Snellings is the only Georgia resident of the two. See Second Amended Class Action Complaint and Jury Demand ¶ 14, 16 ("Complaint") (ECF 66); Stipulation of Dismissal With Prejudice as to Claims of Plaintiff Robert Davis Without Attorneys' Fees or Costs (ECF 117). So it looks like he is the only possible class representative for the proposed Georgia subclass. (There are three proposed subclasses. See Proposed Order Certifying Claims of Kentucky and Georgia Classes, Certifying a Fire Class, Appointing Nagel Rice, LLP as Class Counsel and Appointing the Plaintiffs as Class Representatives ("Proposed Certification Order") (ECF 122-31) at 1-2.)

As noted, the Plaintiff's standing argument is that he bought a car but overpaid for it. See Plaintiffs' Reply Brief in Further Support of Renewed Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Plaintiffs' Reply") (ECF 133) at 2-3.

As a general matter, standing can sometimes be established based on an overpayment. See, e.g., Huertas v. Bayer US LLC, 120 F.4th 1169, 1174-75 (3d Cir. 2024); Joyce v. Jaguar Land Rover N. Am., LLC, 768 F. Supp. 3d 674, 683 (D.N.J. 2025).[3]

Think of a photographer who orders a 6-hour battery that goes for $20. The package comes in the mail --- and the photographer sees that she only received a 4-hour battery, worth $15. What the photographer got (a 4-hour, $15 battery) is worth less than what she paid for (a 6-hour battery, worth $20). A tangible, felt injury --- of a kind that can add up to standing.

Does overpayment work as a standing argument in this case? Maybe yes, maybe no. But things are more complicated than in the simple battery example.

To start to see why, look to the facts.

## B. Facts

The Plaintiff alleges that he was sold a defective car. See Second Amended Class Action Complaint and Jury Demand ("Complaint") (ECF 66) ¶¶ 3-4.

A water pump did not work right. See id. And that, per the Plaintiff, caused a risk that the engine would overheat and there would be a fire. See id.

A serious risk, yes. But for the Plaintiff, a risk that never came to pass. His car never caught on fire.[4]

---

[3] See also Bowen v. Energizer Holdings, Inc., 118 F.4th 1134, 1146-47 (9th Cir. 2024); In re Evenflo Co., Inc., Mktg., Sales Pracs. And Prods. Liab. Litig., 54 F.4th 28, 35-39 (1st Cir. 2022); Cole v. Gen. Motors Corp., 484 F. 3d 717, 722-23 (5th Cir. 2007).

[4] Some other cars did. See Plaintiffs' Brief in Support of Renewed Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Plaintiff's Brief") (ECF 122-1), Exhibit 29A ("Sabla Deposition") (ECF 122-23) at 18:1-18:5 (describing 188 fires related to the defect, across

The carmaker (from here, "the Defendant") announced a recall and the Plaintiff brought his car in for repairs. See Complaint ¶¶ 39-41; see generally Plaintiffs' Brief in Support of Renewed Motion for Class Certification and Appointment of Class Representatives and Class Counsel at 2 ("Plaintiffs' Brief"), Exhibit 24 ("18V-248 Recall Report) (ECF 122-20). The repairs were free.[5] See 18V-248 Recall Report at 9.

There is no information before the Court to suggest that the repairs did not fully fix the water-pump problem. And the Plaintiff's expert seems to assume that there was a complete fix. See Plaintiff's Brief, Exhibit 30 ("Expert Report") (ECF 122-25) ¶ 12.

So the Court follows what it takes to be the Plaintiff's lead, and assumes the defect was fully repaired, that after the car was fixed the Plaintiff had what he had paid for --- a car with no pump defect.[6]

---

different models). The parties disagree on whether the defect caused the fires. Compare Plaintiff's Brief at 3 (yes), with BMW of North America LLC's Brief in Opposition to Plaintiff's Renewed Motion for Class Certification ("Defendant's Brief") (ECF 128) at 4-5 ("possibly related") (emphasis in original).

[5] They took a while --- around 19 days. See Complaint ¶¶ 40-41. During that time, the Plaintiff got free use of a rental car. See id.

[6] Some parts of the complaint refer in general terms to lower value for the car. See, e.g., Complaint ¶ 53 (asserting that the defect "diminishes the resale value of the Class Vehicles"). But it is not clear if this is a factual allegation --- or just a restatement of the basic building-block requirement of any overpayment theory, diminished value on the back-end as measured against front-end expectations. Cf. Badalamenti v. Resideo Techs., Inc., 755 F. Supp. 3d 534, 547 n.16 (D.N.J. 2024). Moreover, the "diminishe[d] . . . resale value" allegation is both conclusory and overarching --- to the point that the Court cannot discern whether value was allegedly lower before repairs were made or also after. If it was the second, that might (or might not, see footnote 34) suggest that the repairs did not fully get the job done. And one way or another, there is no specific allegation as to the Plaintiff's car in particular.

## II. Standing

The parties do not meaningfully take on the standing issues here.[7] Not the key split in the lower-court cases. See Part II.A. Or the possible complexities associated with this case in particular. See Part II.D.

Unpack this starting just below.

### A. The Split

As noted,[8] the Court reads the complaint to allege that the repairs on the Plaintiffs' car completely worked.

When a defective product ends up getting fully fixed, many lower courts hold that there can be no overpayment injury --- and therefore no standing on an overpayment theory.[9] See, e.g., Chan

---

[7] The parties' discussion of standing is brief and general. See Defendant's Brief at 9; Plaintiff's Reply at 2-3. But when there is doubt as to standing, the Court is required to run it down from the get-go, regardless of whether the parties have fully addressed the issue. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-101 (1998); United States v. Hays, 515 U.S. 737, 742 (1995).

[8] See Part I.B.

[9] Note that some courts hold that there is no standing in a related context --- where free repairs are offered, and the plaintiff does not come in for them. See Tarsio v. FCA US LLC, 2024 WL 1514211, at *4-5 (S.D.N.Y. Apr. 8, 2024); Cain v. Johnson Health Tech N. Am., Inc., 2023 WL 12154889, at *6-9 (C.D. Cal. June 23, 2023); cf. Charlton v. LG Energy Solution Michigan, Inc., 2023 WL 1420726, at *4-5 (S.D. Cal. Jan. 31, 2023). Other courts also cut off cases like this one before getting to the merits on another ground --- because any overpayment injury is said to have become prudentially moot in light of a promised successful repair. See Winzler v. Toyota Motor Sales U.S.A., Inc., 681 F.3d 1208, 1211-15 (10th Cir. 2012); see also Solak v. Ford Motor Co., 683 F. Supp. 3d 658, 663-65 (E.D. Mich. 2023); Pacheco v. Ford Motor Co., 2023 WL 2603937, at *2-5 (E.D. Mich. Mar. 22, 2023). In this case, the Court previously addressed prudential mootness for a former class representative whose car caught on fire --- but the Court has not addressed standing, nor prudential mootness, for someone, like the Plaintiff, whose car never caught on fire.

et al v. Nuna Baby Essentials, Inc., 2026 WL 2941359, at *3 (E.D.N.Y. Sept. 30, 2026); Avalos v. Sig Sauer, Inc., --- F. Supp. 3d ---, 2026 WL 1431203, at *4-6 (E.D. Pa. May 21, 2026); Plotts v. Am. Honda Motor Co., Inc., 2026 WL 880413, at *6-7 (D. Minn. Mar. 31, 2026); Cacho v. Mercedes-Benz USA, LLC, 2026 WL 2085604, at *7-8 (N.D. Ga. Feb. 17, 2026); Sugasawara v. Ford Motor Co., 2019 WL 3945105, at *6-7 (N.D. Cal. Aug. 21, 2019); cf. Hadley v. Chrysler Grp., LLC, 624 F. App'x 374, 378 (6th Cir. 2015); Contreras v. Toyota Motor Sales U.S.A. Inc., 484 F. App'x 116, 117-18 (9th Cir. 2012).

Other courts land on the opposite conclusion. See, e.g., Fausto v. Am. Honda Motor Co., Inc., 2026 WL 1345462, at *4-5 (S.D. Ohio May 14, 2026); Rivera v. Am. Honda Motor Co., Inc., 2025 WL 1309536, at *3-4 (N.D. Ill. May 5, 2025); Friche v. Hyundai Motor, Am., 2022 WL 1599868, at *3 (C.D. Cal. Jan. 28, 2022).

On the facts here,[10] it seems that the Court may well need to determine which rule to follow. But none of the cases collected in the preceding two paragraphs are cited by either side.[11]

## B. More Detail

Put aside for now the broader issues noted just above, and look in more detail to the underlying facts here --- these suggest that the question of the Plaintiff's standing here may be especially complex.

The key events, laid out from Time 1 to Time 4.[12]

---

See Davis v. BMW of N. Am., LLC, 2022 WL 3646571, at *3 (D.N.J. Aug. 23, 2022).

[10] As to how things might be different if the record suggested that the repairs did not get the job done, see footnote 33.

[11] The main Third Circuit overpayment cases --- Huertas, 120 F.4th 1169, In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. and Liab. Litig., 903 F.3d 278 (3d Cir. 2018), and Cottrell v. Alcon Lab'ys, 874 F.3d 154 (3d Cir. 2017) --- will presumably shed light on which way the Court should go. But none of these are mentioned in the parties' papers, either.

[12] Precise dates do not matter for now. But note them here, from the complaint. Time 1 is September 6, 2017. See Complaint ¶ 37. Time 2 is around April 23, 2018, when the Defendant reported the defect to federal regulators. See id. ¶¶ 39, 69. Time 3 is June 28, 2018, when the Plaintiff got his car fixed.




And in words:

- At Time 1, the Plaintiff bought his car.[13]
- Next up, at Time 2, the Defendant initiated a recall by reporting the car's defect to regulators.[14] This looks to be the moment when the public first became aware of the defect, and the Court goes forward on that assumption.
- At Time 3, the Defendant fixed the Plaintiff's car.[15]
- At Time 4, the Plaintiff stopped using the car --- vandals apparently destroyed it.[16] At some point after that, the Plaintiff sued.[17]

* * *

In the sections that follow, the Court focuses separately on the three time periods between the bookends. The period between

---

See id. ¶ 41. And Time 4 is sometime later in 2018, when the car was totaled by vandals. See id. ¶ 42.

13 On September 6, 2017. See Complaint ¶ 37.

14 On April 23, 2018, for the Plaintiff's model. See Complaint ¶¶ 39, 69.

15 On June 28, 2018. See Complaint ¶ 41

16 This was at some point in 2018 after June 28. See Complaint ¶ 42.

17 The putative class action was filed in 2019, and the Plaintiff joined as a class representative in 2023. See generally Class Action Complaint and Jury Demand (ECF 1) (filed on October 31, 2019); Complaint (filed on November 3, 2023).

Time 1 and Time 2. Then Time 2 to Time 3, and from Time 3 to Time 4.

For each period, the Court asks what any overpayment injury may have been.

To get at that, first work through the general types of overpayment that look like they may potentially be in play here.

### C. Types of Overpayment

An overpayment injury rests on the idea that a person got less than he paid for. But less of what?

It would seem that two different kinds of things may be in play here.

First, the pump defect may have meant that the Plaintiff got less use out of his car. See Joyce, 768 F. Supp. 3d at 686 n.13. He could not drive the car the way he expected to when he bought it.

And second, the car may have been worth less from a financial perspective because of the bad pump. As an asset, as something to re-sell.[18] The car could have had less value in the marketplace than the Plaintiff had initially expected.

* * *

Go through here in some more detail the distinction between use value and asset value.

Start by noting that not everything has both use value and asset value. To see the point, take some examples.

If someone buys a house and the roof leaks whenever it rains, the homeowner will likely be getting less use than she expected when she bought the house. The second floor, after all, is now off-limits during storms.

And the leak will hurt the asset value of the house, too. Houses that need a roof fix re-sell for less.

In short, less use value from the house and also less asset value.

[18] Or to lease. Or maybe to use as a collateral for a loan.

Now think of a businessman who bought galoshes. They work just fine for a drizzle. But water seeps in whenever he tries to cross even a small puddle on the way to work. Less use than he expected.

But few would say that the asset value of the galoshes is diminished because they are leaky. This is because there is no meaningful retail re-sale market for used galoshes.

The distinction here is between goods that have a use value and an asset value (a house[19]), and ones that realistically seem to have only a use value (galoshes).[20]

* * *

And note that use value and asset value can be separate from each other. So that even when a particular item has both use value and asset value[21] --- the two do not need to rise and fall together.

Think of a homeowner who learns that the house she just bought has shoddy and old wiring. A fire risk.

---

[19] For present purposes, the Court assumes that (i) a car has an assert value and (ii) declines in its asset value can be the basis for standing on an overpayment theory.

[20] The core of the distinction between use value and asset value is a long-noted one. See, e.g., Adam Smith, 1 An Inquiry into the Nature and Causes of the Wealth of Nations 42-43 (London, Strahan, A. 1802) (contrasting "value in use" and "value in exchange"). For some more modern ways of talking about this, see Steven D. Gjerstad et al., Retrading, Production, and Asset Market Performance, 112 Proc. Nat'l Acad. Scis. 14557, 14557-58 (2015) (distinguishing between re-tradable goods, which have value to others in a re-sale market, and non-re-tradable goods, which do not). Accord Sabia M. Inoua & Vernon L. Smith, Re-tradable Assets, Speculation, and Economic Instability at 2-3 (Econ. Sci. Inst. Working Paper No. 12-2021) (draft) (same). A similar distinction is sometimes drawn in accounting. See Christine Botosan & Adrienna Huffman, Decision-Useful Asset Measurement from a Business Valuation Perspective, 24 Acct. Horizons 757, 761-62 (2015). Are there things that have an asset value but no use value? Yes. A stock, for example, that comes with no voting rights.

[21] Like the house, not like the galoshes.

But say that the homeowner is nonplussed. She leaves the wiring as is, in place. And the fire risk does not lead her to change things. She does not unplug some appliances, or shut off the air-conditioner overnight. And say, too, that the bad wiring does not actually lead to a fire.

In these circumstance, there has been no reduction in the use value of the house for the homeowner. The wires are sub-par, but that has changed nothing. The homeowner is using the house exactly as she expected to.

Is there a reduction in asset value? Almost surely yes. A house with a real fire risk will re-sell for less.

* * *

Two relevant takeaways from all this.

First, some items have both use value and asset value --- and the Court assumes[22] that a car is one of them.

Second, use value and asset value are not necessarily a yoked pair. They can move independently. In the example of the house with the bad wiring, use value stayed the same, while asset value fell.[23]

**D. The Periods**

With all this in the background, come back now to this case.

For each of the three periods marked out on the timeline, see Part II.B, ask the same two questions.

First, was there less alleged use value --- and can that count as an injury for standing purposes? And second, was there less alleged asset value --- and can that amount to a standing injury?

---

[22] See footnote 19.

[23] Can it run in the other direction? Can use value fall while asset value stays the same? Probably yes. Think, for example, of a small problem with a house's built-in sprinkler system. The problem might vex the homeowner who lives with it every day. And it might reduce the use value to her of her house. But in the scheme of things, the problem might be too small and slight to realistically get reflected in the re-sale price of the house.

### 1. Time 1 to Time 2

Start with the interval from Time 1 to Time 2 --- when the Plaintiff was using his car before the water-pump defect became publicly known. See Part II.B.

* * *

During that period, did the defect reduce the car's asset value?

Hard to see how.[24] After all, the defect during this time was latent. No one[25] is alleged to have known about it. Something that is unknown publicly cannot readily be factored into the market price, or impact someone's purchasing decision.

People might pay less for a car that has a defect they are aware of. But why would they pay less for a car that, for all they know, has no defect?

* * *

What about a slip in the car's use value during the Time 1 to Time 2 period?

There certainly would have been much less use value during this period if the Plaintiff's car had caught fire. But that did not happen.[26]

---

[24] The Court proceeds here by inference as a second-best fallback option --- because of the sparseness of the information put before it as to any actual asset-value declines from Time 1 to Time 2. See footnote 6.

[25] Outside the carmaker-Defendant. See Complaint ¶¶ 7, 9.

[26] The risk of a fire plainly posed some real danger. But that danger was "only 'in the air,'" never "touch[ing] down and caus[ing] real-world injury" or affecting the Plaintiff's use. Spencer Sav. Bank, S.L.A. v. Vasta, 2025 WL 2070818, at *2 (D.N.J. July 23, 2025) (cleaned up). At least as to potential tort claims (and that may be the best way to understand the Plaintiff's claims here) danger that stays up "in the air" --- that "is usually the stuff of government enforcement action." Spencer Sav. Bank, 2025 WL 2070818, at *2. And that may have implications for standing, at least on some views. In particular, some believe that Article III standing limits on private plaintiffs are there, in part, to preserve the executive branch's Article II space to pursue (or to opt not to pursue) enforcement and regulatory actions directed at gathering risks, even before they have caused real-world harm. See Joyce, 768 F.

And even if there had been no fire, there might have been a decline in the use value of the car if the Plaintiff --- aware of the risk of fire --- took preventive steps that then made the car less useful to him.

Maybe, for example, he opted not to use his car for his daily commute --- because he did not want to park in his office's under-the-building indoor garage, an especially dangerous place for a fire. Or maybe he chose not to take his car on long trips to visit relatives. Because if a fire were to happen far from home --- he could get stranded, and it could be tough to find a good mechanic.

Preemptive measures can lead to diminished use. And they might at least potentially count as the basis for an overpayment injury for purposes of standing law.[27]

But there are no allegations here of any preventive measures from the Plaintiff.

And again, it is not clear how there might be any. The Plaintiff could hardly have taken steps to forestall a fire risk that he did not know was there.

* * *

To sum up.

The Plaintiff's standing theory relies on overpayment --- he got less than he expected (and paid for) when he bought his car. When it comes to a car, take less asset value and less use value as each being in play.[28] But was there in fact less of these during the Time 1 to Time 2 period?

There is virtually no information to work from on this.

And when it comes to taking a step or two by inference, it is not clear what the lowering of asset or use value might have been. The public was apparently not aware of the defect --- so it is not obvious how the defect could have pulled down the car's re-sale value.

---

Supp. 3d at 682 n.11 (describing and noting this theory, but taking no position on it).

[27] The Court expresses no view on whether they can indeed count.

[28] See Part II.C; footnote 19.

And as to potentially lowered use value, there was no fire. And no preventive steps to stave off the possibility of a fire, either.

* * *

Can there be standing in these circumstances?

"No" seems to be the verdict of three circuits. See Julian D. Melendi, Searching for Standing: Benefit-of-the-Bargain Theory of Injury, 93 U. Chi. L. Rev. 1555, 1567-77 (2026).

Under the Eighth Circuit's "manifest defect rule," for example, a plaintiff cannot generally be said to have suffered a standing-generating injury until a product's defect causes some practical harm. See Johannessohn v. Polaris Indus. Inc., 9 F.4th 981, 987-88 (8th Cir. 2021).

The facts of Johannessohn are like the ones here. A vehicle's heat defect created a fire hazard. See id. at 984. But there was no fire in the end. See id. at 987. And the unrealized risk of fire was not enough to generate standing, the Eighth Circuit held, even if that risk meant that the Johannessohn plaintiffs may have overpaid. See id. at 987-88.

* * *

Would Johannessohn state the law in the Third Circuit?

Maybe not. After all, the Third Circuit held in Huertas that there was standing where plaintiffs overpaid for contaminated healthcare products, even though they suffered no physical harm from that contamination. See 120 F.4th at 1175-78.

Out of the gate, Huertas seems to suggest that, against the Eighth Circuit, there can be standing in this case, as to the Plaintiff.

But on a closer look, Huertas may not be controlling.

In that case, there was a negative effect on the plaintiffs' use of the relevant product. In fact, they stopped using it because of the defect. See Huertas, 120 F.4th at 1176 n.11. Not so here, in this case.

Moreover, Huertas did not cite or discuss the manifest-defect-rule cases. That makes it harder to tell whether the Third Cicuit meant to go in a different direction than, say, Johannessohn.

And finally, another relevant Third Circuit case may tilt things in the Johannessohn direction. The case is In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Liability Litigation, 903 F.3d 278 (3d Cir. 2018). There, the plaintiffs claimed that they overpaid for carcinogenic baby powder, though they themselves (i) used the baby powder and (ii) did not end up with cancer. See id. at 281-82. So no loss in use value. And per the Third Circuit --- no standing. See id. at 285-90.

* * *

Between them, Johannessohn, Huertas, and J&J raise questions as to the Plaintiff's standing in the Time 1 to Time 2 period[29] --- during which it seems there was no alleged loss in either the car's asset value or its use value.

But no party mentions any of these cases. The Court can resolve the relevant issues on its own. But the wiser course is to do so after getting input from the parties.

### 2. Time 2 to Time 3

Now look to the second period, that runs from Time 2 to Time 3. After the Defendant had publicly announced the recall, but before it fixed the Plaintiff's car.

* * *

Start with the car's use value.

As before, no fire --- so no loss in use value from that direction.

Did the Plaintiff take preventive steps that reduced his use of the car? The Plaintiff inches closer to saying so. He says he was told to limit his car's use and to avoid parking in his garage, for instance. See Plaintiff's Brief, Exhibit 10 ("Snellings Deposition") (ECF 122-10) at 82:18-21. But nothing is there to indicate that the Plaintiff did, in fact, change his behavior in response to this asserted instruction.

* * *

Now look to the car's asset value.

---

29 And beyond, as discussed below.

It stands to reason that the car's asset value may possibly have come down during this period. The public knew about the defect and the fire risk it generated. And it would make sense to think that a car is worth less on the re-sale market if people know it might catch fire.

But there is no meaningful information before the Court on any of this. See footnote 6.

Putting that factual point aside, ask a legal question: does a decline in asset value matter for standing purposes if nothing comes of it for the asset's owner?

Someone who sells in a down market takes a hit, and feels the sting of an injury --- of the sort that standing can presumably be based on.

But here, there are no allegations that the Plaintiff sold or tried to sell his car. It was destroyed by vandals.

So for the Plaintiff, any price fall may have been abstract. Something lurking in the background that, in his case, never had a real-world impact.

Is that enough to the Plaintiff[30] for standing?

There are reasons to think the answer is yes. See Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 (1979) ("[C]onvincing evidence that the economic value of one's home has declined as a result of the conduct of another certainly is sufficient under Art. III to allow standing[.]"); see also Martone v. Robb, 902 F.3d 519, 523-24 (5th Cir. 2018) (rejecting argument that plaintiff had to sell a security at a reduced price to demonstrate standing); Maya v. Centex Corp., 658 F. 3d 1060, 1070-71 (9th Cir. 2011); Allandale Neighborhood Assoc. v. Austin Transp. Study Pol'y Advisory Comm., 840 F.2d 258, 262-63 (5th Cir. 1988) ("To be sure, such a loss remains in one sense unrealized until the property is sold. Nevertheless, a market devaluation has present adverse consequences short of

---

30 "What's it to you?" Food and Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024) (discussing this question as a touchstone for determining if there is standing, and quoting for this question Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)).

realization through sale."); Swain v. Wilmington Tr., N.A., 2018 WL 934598, at *2-4 (D. Del. Feb. 16, 2018).

But do the just-cited cases control when, before a sale is made, the defect that caused the asset value to slip is fully fixed --- as, for now, seems to be the case here? A price decline as a basis for standing is one thing. But what if the price just bounces back? See generally Part II.A (discussing how most district courts have resolved this question).

And more. A price decline may count as a possible Article III injury even before a sale as to an asset[31] that will presumably be sold one day. But what about a price decline as to an asset (like the car in this case), that can never be sold --- because before any sale could happen it was totaled?

In addition, while there are "present adverse [financial] consequences short of realization through sale," Allandale Neighborhood Assoc., 840 F.2d at 262-63, when certain sorts of assets lose their value --- is that true as to a car?

The above questions are suggested by this case, but the parties do not take them on.

### 3. Time 3 to Time 4

This period starts with the defect being repaired and ends with the Plaintiff's car being destroyed.

The issues for this interval are like the issues for the other ones.

As to declines in use value --- no solid information that, even after the repair, the Plaintiff's use of his car was impacted.

As to declines in asset value --- just the same sparse information alluded to above.[32] No suggestion of a loss of asset value premised on the idea that the fix did not fully work.[33] Or

---

[31] Like a house (as in Gladstone Realtors, 441 U.S. 91) or a stock (as in Martone, 902 F.3d 519).

[32] See footnote 6.

[33] If that were the case, it would likely change the picture. See, e.g., Moncada v. Nuna Baby Essentials, Inc., 831 F. Supp. 3d 268, 277 (S.D.N.Y. 2026); Jasinski v. Kia Am., Inc., 2026 WL 1413550, at *1-2 (E.D. Pa. May 20, 2026); Comes v. Harbor Freight Tools USA, Inc., 2021 WL 6618816, at *4 (C.D. Cal. Sept.

of a loss of asset value because of the recall even though the fix was good.[34]

## III. Next Steps

The issues here at to the Plaintiff's standing may potentially be complex, but for now they have not been developed enough.[35]

As to possible next steps, the Court will today issue an order.[36]

---

29, 2021); Peckerar v. General Motors, LLC, 2020 WL 6115083, at *2-3 (C.D. Cal. Aug. 17, 2020); cf. Maadanian v. Mercedes-Benz USA, LLC, 2024 WL 1579658, at *2-3 (W.D. Wash. Apr. 11, 2024). But here, the Plaintiff seems to take the opposite tack. His expert assumes that the repair was perfectly competent, and that the car's post-repair value is the same as it would have been absent the defect. See Expert Report ¶ 12.

[34] This may sometimes happen. See Robert G. Hammond, Sudden Unintended Used-Price Deceleration? The 2009-2010 Toyota Recalls 2-4, 13-16 (2012), https://ssrn.com/abstract=2057096; cf. Mark W. Nichols & Gary M. Fournier, Recovering from a Bad Reputation: Changing Beliefs About the Quality of U.S. Autos, 17 Inter. J. Indus. Org. 299, 309-14 (1999); Raymond S. Hartman, Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation, 69 Rev. of Econ. & Stat. 367, 367 (1987).

[35] The Plaintiff's expert report presents a theory of harm based on a standard (and generic) expected utility table. The table assumes that people expect a little less value each year from the cars that they buy. See Expert Report, Appendix at 1-3. And from this, the expert seems to suggest that, when the car owners in this case bought their cars, they did not get the expected annual utility they should have received --- because their cars were defective. See Expert Report ¶¶ 9-10. But this only aims to get half the job done. An overpayment theory is based on a gap between expectations and outcome. The expert report lays out in stylized fashion a car buyer's year-over-year expectations. But what is missing is the other side of the ledger --- a case-specific sense as to how this particular Plaintiff's expectations may have been dashed, as to asset value and/or as to use value.

[36] Two things here. First, standing is not an all-or-nothing thing. There may ultimately be standing for the Plaintiff --- but not as to all claims and all periods as to which he seeks to represent the proposed class. Second, there may be some

On this 26th day of October, 2026.

Michael E. Farbiarz, U.S.D.J.

overlap between issues as to the Plaintiff's standing and issues that, later, could impact the standing of people other than the Plaintiff --- like members of the two proposed sub-classes whose cars did not catch on fire. But those possible issues are for a bit later, see Huber, 84 F.4th at 154-55, and the Court does not express any opinion on them. This said, how those standing-type issues are resolved could come up soon --- in connection with Rule 23 predominance questions. See id. at 155-58.